Mr. Justice Cox
delivered the opinion of the court:
The question of paramount importance in this case is, how far the Orphans’ Court is empowered, by the Act of Assembly of Maryland of 1798, ch. 101, sub-ch. 12, sec. 10, to order a sale by a guardian of his ward’s real estate on account of the ward’s maintenance and education.
This statute was continued in force as the law of this District by the act of Congress entitled “An act concerning the District of Columbia, approved February 27, 1801.”
*202 It will assist us in the interpretation of the act to consider the state of the law of Maryland on this subject at the date of its passage.
There were, at that time, several acts in force under which proceedings could be instituted affecting the title of infants to their real estate.
By the act of Assembly of 1785, ch. 72, sec. 12, the chancellor was empowered to direct a sale of lands in which an infant had a joint interest or interest in common with any other person or persons, on its appearing that it would be for the advantage of the infant as well as of the others, he taking care that the infant’s share in the proceeds be paid over to him.
But the object of this act was simply partition. It was as much in the interest of the adult co-owner as of the minor, and enabled the former to sell his property, which he could not do without the aid of the law, on account of the disability of his co-tenant. But it contained no provision as to the management and application of the minor’s share, and did not apply at all to property held by him in severalty. Indeed, on the next day after this act was passed, the act known as chapter 80 of the same session was passed, which did undertake to direct the application of the minor’s estate, and which limited the consumption of the principal to the personal estate.
So, under the Act of Descents of 1786, ch. 45, if descended lands could not be partitioned between the heirs, they might be sold by commissioners under an order of the county court, if the land all lay in the same county, from which order an appeal might be taken to the chancellor. If the lands lay in different counties, the chancellor might directly decree the sale. In this case, the sale was ordered without reference to the interests of any infant heir, but because of the impossibility of partition.
In virtue of its inherent jurisdiction over the subject of partition, the Court of Chancery has exercised original concurrent jurisdiction with the county courts, in the cases provided for by this statute.
*203 There were other acts providing for the sale or conveyance of property in which infants were interested, for the benefit of creditors of the ancestor, or in pursuance of contracts made by him.
But the above-mentioned statutes constitute all the legislation of Maryland before the act of 1798, which authorized the sale of infants’ property in the interests of the parties entitled.
It will he seen that it is limited to cases of ownership by the infant jointly or in common with others, and that it does not contemplate any disposition of the minor’s estate beyond its conversion into money. Certainly no authority could be claimed, under the acts referred to, to apply the principal of the estate to maintenance or education.
The Court of Appeals of Maryland, in several cases of comparatively recent date, have expressed the opinion that the Court of Chancery had an inherent power to decree the sale of an infant’s real estate, independently of statutes authorizing it.
The first case in which this occurred was that of Dorsey vs. Gilbert, 11 Gill & J., 87, decided in 1839. A private act had been passed authorizing the chancellor to decree the sale of an infant’s realty. The chancellor held the law to be unconstitutional. The Court of Appeals reversed his decision and sustained the law. In the course of the opinion they say: “It was an undoubted power of the Court of Chancery, before any of our legislative acts authorizing the sale of infant's estates, to convert the real estate of an infant into money; and many cases may be found where the guardians of infants, under particular circumstances, have been authorized to make this conversion. 2 Story’s Equity, 585, 586, 587. The Court of Chancery, in the exercise of this jurisdiction, acted under a delegated authority from the king, who, as parens patrice, had jurisdiction over the persons and estates of infants.”
The Court of Appeals did not assume to act.under this extraordinary power in the particular case, because there ■was a special statute to authorize the sale, and its decision *204 was simply to uphold that statute as valid. The proposition above announced was not necessary to the decision of the case, and may be considered a dictum merely; yet it was followed by similar dicta in Downin vs. Sprecher, 35 Md., 474 ; Long vs. Long, 62 Md., 33; and a still more recent case of Taylor vs. The Peabody Heights Co., reported in the Central Reporter, vol. 3, No. 18, p. 867.
These expressions of opinion are not authoritative for us, and, in passing, I take occasion to say that, in my judgment, they are clearly erroneous.
The power seems to be asserted for the chancellor, on the ground that it had been exercised by the Court of Chancery of England ; and the only authority cited for this is Story’s Equity Jurisprudence.
The court was evidently misled by the general language of Story, asserting that a guardian will sometimes be allowed to convert personalty into realty and realty into personalty. Upon an examination of the cases referred to by Story, it will be found that they are principally cases in which the money of a ward was laid out in the purchase of land. In some of them it appeared that timber had been sold and the proceeds invested for the ward or applied to incumbrances. And these last are the only illustrations given of the conversion of realty into personalty. The guardian has also been allowed to lease his ward’s land. But not a case is cited in which the chancellor decreed a sale of the infant’s freehold estate. On the contrary, Lord Hardwick said, in Taylor vs. Phillips, 2 Ves., sr., p. 23: “ There is no instance of this court’s binding the inheritance of an infant by any discretionary act of the court. As to personal things it may be done, but never as to the inheritance, for that would be taking on the court a legislative authority, doing that which is properly the subject of a private bill.”
It would seem, then, that the only ground for the proposition of the Court of Appeals fails. But it is not so important what may have been thought by that learned court at the late dates of the cases referred to. The important *205 question is, what was understood to be the law at the time when the act of 1198 was passed, because we are to read that statute in the light of existing law.
At that time no court in Maryland had asserted this power of sale, and there is no reported case either before or after that date in which either the chancellor or any county court, sitting as a court of equity, has ever decreed the sale of an infant’s freehold in virtue of this extraordinary power of the parens patrice, or in other cases than those provided for by statute.
On the contrary, as late as 1828, Chancellor Bland, in the Williams Case, 3 Bland, 186, reviewed this whole subject and examined all the English authorities at length, and said:
“Nor have I been able to find any case in the English books in which the court has undertaken to change the nature of an infant’s inheritance by selling the land itself and investing the proceeds for his benefit, or in which the court has sanctioned any such sale made by the guardian or trustee of an infant.” And again, after referring to sales made for partition or for payment of mortgage debts, he says: “And therefore it is that the English Court of Chan-, eery has never, except in the cases above mentioned, undertaken to dispose of an infant’s land or inheritance in real estate, and that, although many cases have arisen in which the income of an infant’s estate has been found to be entirely insufficient for his support, yet it has rarely occurred that the court has broken in upon the capital of even his personal estate for the purpose of maintenance, though it has frequently done so for his education and putting him out in life.”
If any Maryland authority existed before this date, for the power more recently asserted by the Court of Appeals, Chancellor Bland would surely have known it and referred to it.
It could hardly be, then, that any such opinion prevailed in Maryland thirty years before the date of this opinion.
But even were it otherwise, it is to be observed that the *206 proposition asserted by the Court of Appeals does not go far enough to be available for this discussion. It declares the power of the chancery to decree a .conversion, but no more. It does not assert the power to do that on account of the maintenance and education of the ward, and to apply the proceeds to those objects. And the very ground on which the special act on which the case of Dorsey vs. Gilbert was based, was justified as constitutional, was, that while it was only an enlargement of the existing power of the Court of Chancery, “the property of the infant is not (by it) in any manner impaired or lessened, but a change in its character, alone, effected.”
We may safely assume, then, that before the act of 1798 there was no authority in any court in Maryland to decree a sale of an infant’s realty for maintenance or education, or for any object except those provided for in the statutes referred to.
If he possessed personalty, the Orphans' Court might allow his guardian to apply a tenth part of it annually for his eduction, under authority of the act of 1785, ch. 80.
But if he was an orphan, having no legal claim for support upon any one, and his whole patrimony consisted of unproductive realty, his condition was lamentable. However refined his associations may have been, and however capable he might he of receiving a liberal and professional education, his only resource, for a support,, was to be bound out as an apprentice, under the act of 1715, ch. 39, unless some charitable person would assume his maintenance and education. His real estate, however ample, was unavailable for those objects, unless, indeed, he would go in debt for necessaries, and leave his creditors to their common law remedies against his property.
In this condition of affairs, the act of 1798-, ch. 101, was-enacted, “for amending and reducing into system the laws and regulations concerning last wills and testaments, the duties of executors, administrators and guardians, and the rights of orphans and other representatives of deceased persons,” the 12th sub-chapter,, section 10> of which says: “And *207 once in each year, or oftener, if required, a guardian shall settle an account of his trust with the Orphans’ Court; and the said court shall ascertain, at discretion, the amount of the sum to be annually expended in the maintenance and education of the orphan, regard being had to the future situation, prospects and destination of the ward; and the said court, if it shall deem it advantageous to the ward, may allow the guardian to exceed the income of the estate and to make use of Ms principal, and to sell part of the same, under its order; provided, nevertheless, that no part of the real estate shall, on account of such maintenance or education, be diminished without the approbation of the Court of Chancery, or general court, as well as of the Orphans’ Court.”
It will be observed that the power conferred is not, in ■terms, limited to personal estate. The income of the estate may be exceeded, and part of the principal may be sold.
It will not be disputed that the terms “estate” and “principal” are comprehensive enough to embrace everything real and personal, owned by the infant. Is there anything in the context or in the subject-matter to limit their sense, in connection with the power of sale conferred?
Section 5th provides that on the guardian’s executing his bond, the court shall have power to order the land, distributive share or other property of the ward to be delivered to the guardian.
Section 6th directs the guardian to have the real estate appraised and the annual value thereof estimated.
Section ?th forbids waste, but allows the wood to be cut down under order of the court, for the ward’s education and maintenance.
Section 8th directs the guardian to lease out the real estate, or allows him to undertake it on his own account and be ansioerahle for the annual value, to be every third year ascertained.
Section 9th directs the guardian to account for the profit and increase of the estate or annzlal value as aforesaid.
Thus the first of these sections grouped together the real and personal estate. Sections 6, ?, 8 and 9 refer entirely to *208 the real estate. Section 9 speaks of it as the estate and then follows immediately Section 10, the one under consideration, in which permission is given to exceed the income of the estate — the precise word which in the preceding section referred to realty — and to sell part of the principal. As the preceding four sections had reference solely to real estate, and the last described it generally as the estate, it is difficult to understand why the same word in this section should not embrace the realty.
The power to sell the personalty — 10 per cent, of it annually — already existed under the act of 1785, ch. 80. If it was intended by the act of 1798 merely to re-enact this, or to extend it to all the personalty, why was the phraseology changed and the word personal omitted ?
If it does not appear from the foregoing considerations that it was omitted de industria, and the power of sale was extended to the realty as an amendment to the existing law, it is made demonstrably clear by the proviso to section 10th.
The function of a proviso in a statute is to qualify or restrain the enacting clause.
The enacting clause here confers a power to order sale of part of the principal of the infant's estate, on account of his maintenance or education. The qualification is that the real estate shall not be diminished on account of the maintenance or education, without the approbation of the Court-of Chancery, &c. Diminished how? Clearly, it means, by the exercise of the power of sale conferred in the preceding clause, i. e., the realty shall not be diminished by such sale without, &c. Why add this qualification unless, without it, the Orphans’ Court would have the unrestrained power of selling, by tirtue of the enacting clause ?'
Again, what do the words, “ as well as of the Orphans’ Court,” at the close of the section, mean, if not that the Orphans’ Court is to allow a diminution of the realty by its-order of sale, first, and that the approbation of the other court is to be had as well ?
The proviso then clearly assumes that the previous clause *209 conferred the power to order a sale of the realty; and it was designed as a check upon its exercise.
There is no question of implied or incidental powers.
The question is, whether the power to allow the guardian to exceed the income of the estate and to sell a part of the principal, does not mean, if the estate consists of realty, as in this case, a power to exceed the income of the realty and to sell part of that for the maintenance and education of the ward. The context is resorted to, not to infer powers not expressed, but to throw light on the express grant, if it needs any elucidation.
More properly, it may be said that the proviso is referred to as irreconcilable with the position that the expressed grant means less than its terms naturally import, and ought to be narrowed and restrained by construction.
The conclusion seems to me inevitable, that the statute conferred upon the court the power to order a sale of part of the minor’s real estate for his education and maintenance.
Allusion has been made to the non-existence of any practice under this section of the statute in Maryland, and to the absence of any adjudicated case sanctioning such a practice.
The Act of Assembly of Maryland of May 8th, 1816, would account for the non-existence of the practice in that State since that date. The act provides for sales of infants’ property by decree of the chancellor, or of the several county courts of the State, sitting as courts of equity. The 8th section enacts that “no part of the principal arising from the sale of any real estate by virtue of the law shall be applied toward the maintenance or education of any infant, unless the chancellor or the county court, as the case may be, shall consider it necessary for the education or maintenance of the minors.” This, by implication, gives to the chancellor or county court the power to order the application of the principal to the minor’s maintenance or education. As this act was very comprehensive in its provisions, and could be administered by any of the county courts sitting in equity, it is quite likely that it superseded the antecedent legislation, in the practice of the courts, and occasion *210 did not arise for direct judicial decision of the question now before us.
But whatever expression of opinion we find in the Maryland courts or other authorities, is in favor of the interpretation we have given to the statute.
In the Williams case, decided in 1828, which was a case under the Act of Maryland of 1816, Chancellor Bland, as already stated, discussed the whole subject of the power of the Court of Chancery to decree the sale of realty owned by infants. He also reviewed the legislation of Maryland on the subject, including the act of 1798, now under consideration. In his report of the case, published in 1841, he adds, in a note to this part of his opinion, a reference to the Goltier case, decided by Chancellor Kilty in 1810.
In that case, the father of certain minors petitioned the Orphans’ Court, setting forth that his children had inherited an undivided interest in certain real estate; that the other heirs had contracted to sell the property; that he believed it would enable him to educate and support the children more advantageously if he should sell and convey on behalf of the children also, and asked that he be authorized to make the conveyance. The Orphans’ Court passed an order authorizing it, and Chancellor Kilty afterwards approved it, expressly, under the power vested in him by the act of 1798, eh. 101, &c.
This case is extracted from the Chancery Proceedings. It shows that before 1816, the act of 1798 was understood by at least one Orphans’ Court, and the then chancellor, as we have heretofore understood it, and it may be considered as evidence that our practice existed in Maryland at that time. It is a circumstance, too, not without interest, that Chancellor Kilty had been the Chief Justice of the Circuit Court of the District up to the year 1806, about five years before the Goltier case was decided.
This case is cited by Chancellor Bland, as already stated, in a note to his review of the Maryland Statutes, without comment, and it is to be assumed that he refers to it as an authoritative exposition of the law.
*211 ín tíre same note lie refers to tire case of Brodess vs, Thompson, 2 Harris & Gill, 120, decided in 1828 also.
That was an action for the value of certain improvements constructed on the defendant’s real estate by authority of his guardian, who had contracted to 'apply part of the ward’s principal to payment for them, and that with the sanction of the Orphans’ Court.
The question Was whether the Orphans’ Court had authority to allow the guardian to exceed the income and apply part of the principal to any other object that the maintenance and education of the ward.
The Court of Appeals held not, and said: “By the 9th section of that law (the act of 17-85) the Orphans’ Courts are invested with the authority to allow the guardian to apply a partuf the personal 'estate, not exceeding a tenth part thereof, to the education of his ward. The act of 1798 only enlarged this authority by extending the expenditure to any part or the whole of the personal estate if necessary. The better education of the ward is the object of both laws, and the general expressions used in the 10th section are to be construed with reference to this object. * * * That the legislature did not mean to extend the expenditure of the principal to any of the objects than those personal to the ward, is plain from the language of the 10th section, in the closing part of it, ‘no part of the real estate shall,on acount of such maintenance or education,’ be diminished without, &c. * * Clearly indicating, by the relative terms, such*maintenance 'or education, the object of expenditure authorized in the first part of the same section. Should an application of the personal estate not suffice to maintain and educate suitably to the future destination of the ward, then such maintenance and education may also induce an application of-a part of the real estate, with the approbation of the Court of Chancery, or general court, as roell as the Orphans’ Court.”
This seems to be a clear recognition 'of the powers of the -'Orphans’ Court to decree the ‘sale of the realty and it was •evidently so understood by Chancellor Bland when he *212 cited this case in the same note with the Goltier Case before referred to.
So, in the case of Hatton vs. Weems, 12 Gill & J., 83, decided in 1841, which was a suit brought Joy a cestui que trust against the trustee of an estate, for an account, the court referred to the analogous case of a guardian, and said: “According to our laws, a guardian cannot encroach on the capital of his ward’s estate without the order of the Orphans’ Court, nor can the real estate he diminished but by the approbation of the Court of Chancery.”
Although hot so pointed as the other case, this seems also to recognize the order of the Orphans’ Court, with the approbation of the Court of Chancery, as competent to transfer the realty of the ward.
Mr. Alexander, in his well-known and authoritative work on the Chancery Practice of Maryland, published in 1839 or 1840, says: “The Court of Chancery has a general control over the persons of infants in regard to their guardianship, maintenance and marriage. But it is seldom that an occasion is presented for the exercise of these powers. The Orphans’ Court may appoint a guardian to an infant who has acquired an estate in any manner and who is destitute of a testamentary or natural guardian. The power to appoint a guardian with authority to take possession of the estate, has very naturally drawn to itself the power of appropriating the estate to the maintenance of the infant. The only case in which the interposition of chancery seems to be necessary, is where a sale of a part of the infant’s real estate is required for the purposes of maintenance and education.” For this, he refers to sec. 10 of the act of 1798, sub-ch. 12.
He, then, clearly understood the diminution of the ward’s real estate, referred to in the act of 1798, to mean a sale of it, through the concurrent action of the Orphans’ Court and Chancery Court.
We have, then, the Chancellor, the Court of Appeals and text writers of Maryland, down to a late date, recognizing, as a thing of course, the authority of the Orphans’ Court to *213 decree a sale of realty, and not an intimation of opinion against it from any quarter.
But if it had been otherwise, since the cession of the District of Columbia, it must be remembered that this statute came to us about two years after its enactment, as the law of this jurisdiction, without any interpretation by the highest Court of Maryland, and the Circuit Court of this District had as complete authority to interpret for the District as the Court of Appeals of Maryland had for that State; indeed, as much so as if it had been, originally, an act passed by Congress for this District.
In the exercise of this authority, the Circuit Court, and since its abolition, this court, its successor, have always interpreted the act of 1798 as conferring a power on the Orphans’ Court to decree the sale of an infant’s realty under the circumstances mentioned in section 10, sub-ch. 12, of the ■ act; and it was assumed, without discussion, in the General Term, as late as 1874, in the case of Mansell’s Appeal.
The practice of decreeing such sales has prevailed through a period of sixty or seventy years in extent; large amounts of property have changed hands through such sales, and many titles depend upon their validity. If anything can be said to be a rule of property in this District, our interpretation of the statute must be so considered.
This being the case, even if we doubted its propriety, would we be justified in reversing it, with the effect of unsettling titles and affecting values to an extent that cannot now be appreciated?
In the case of Doolittle vs. Bryan, 14 How., 563, the court said: “In the present case it is said the land was sold in 1829; the purchaser paid his money and obtained his deed on the faith of a judgment of the court that the sale was regular, and has held the land under this title ever since. Hundreds of similar cases may probably be found where the same ohjections to the sale exist. Under such circumstances, a court should be even astute in avoiding a construction which may be productive of much litigation and insecurity of titles.”
*214 In the case of Smith vs. Black, 115 U. S., 308, the mere probability that a decision of the old circuit court as to the power of a trustee to sell through an agent had been followed as a rule of property, was persuasive with the Supreme Court against sanctioning a departure from it. How much stronger the present case, where we know that many titles rest upon the rule of property which is now assailed.
An important feature of the present case is, that we are not sitting on appeal from an Orphans’ Court decree of sale, in which case, even, we ought to hesitate to pronounce-an opinion subversive of the past and settled rule of title, but we are called upon, in a collateral proceeding, to overthrow rights acquired over forty years ago under a decree never reversed or even appealed from, but passed at a time when its legality was assumed in the prevailing construction of the law.
The language of the Supreme Court in Douglas vs. County of Pike, 101 U. S., 677, is quite pertinent to such a case. It was an action on certain county bonds issued and bought after their legality had been affirmed by the State court, but which subsequently the same court held to be illegal. The court say: “ The true rule is to give a change of judicial construction, in respect to a statute, the same effect in its operation on contracts and existing contract rights that would be given to a legislative amendment; that is to say, make it prospective but not retrospective. After a statute has been settled, by judicial construction, the- construction becomes, so far as contract rights acquired under it are concerned, as much a part of the statute as the text itself, and a change of decision is, to all intents and purposes, the samé in its effect on contracts as an amendment of the law by means of a legislative enactment.”
Therefore, although they ordinarily followed the interpretation of its statute by the highest court of a State, they refused, in that case, to give it the effect of overthrowing a former rule of decision under which rights had been acquired.
If this District were- a State, no doubt the Supreme Court *215 would apply this rule by upholding our former construction of the statute as far as it affected the present case, however we might have changed our views of the law since.
And although in the exercise of their appellate power in this District, the Supreme Court would act upon their own judgment and not feel bound to follow ours, in the interpretation of our local statutes, it can hardly be doubted that the sentiments above expressed would lead to the same results.
The next question is, whether the act of 1798, ch. 12, sec. 10, is repealed by the act of Congress of March 3, 1843, entitled, “An act to provide in certain cases for the sale of the real estate of infants within the District of Columbia.”
There is no such repeal, unless by implication. Bepeals by implication are not favored by the courts.
In the absence of any repealing clause, it is necessary to the implication of a repeal that the objects of the two statutes are the same. If they are not, both statutes will stand, though they refer to the same subject.
And it is further necessary to such repeal that there be a repugnancy between the statutes, or that one be plainly intended as a substitute for the other. U. S. vs. Tynen, 11 W., 88; Claflin vs. U. S., 97 U. S., 546.
The act of 1843 provides for the sale of the whole or any part of the infant’s real estate, whenever it appears that the interest of the infant manifestly requires it. The object, therefore, is to promote the infant’s interest generally. When the sale is made the proceeds are to be vested and applied — i. e., invested and applied — in the purchase of other real property, or invested and applied in such other manner as the court may think best. And these proceeds, if the infant dies under age, are to be considered real estate, and pass, as such, to the person who would have been entitled if no such sale had been made.
The prominent object of the act evidently is a ehangVof investment for the infant’s benefit.
And another object seems to be to preserve the fund for his heir-at-law, in case of his death under age. As the in *216 fant could not make a valid devise, the property, then, upon his death under age, would necessarily descend to his heir. But a conversion of it into personalty would deprive the heir of it but for the particular provision of the act. There is no express authority to apply the proceeds otherwise than by vesting or wresting them. They are to be vested and applied in a purchase of other realty, or in .some other manner. There' is no authority to consume the principal. It is argued that such authority is implied by the words “so much thereof (i. e., of the proceeds of sale), as may remain at his death, shall be considered real estate,” &rc., &c. But this evidently means so much thereof as may remain in the shape of personalty, because it was needless to say that of real estate. And that would apply to what was not reinvested in other real estate. It was not necessary to read it as of what remains after a part of the principal has been consumed. After directing that the proceeds might be reinvested in realty, this clause had, for its object, to impress the character of realty on all that might remain in the form of personalty, for the benefit of the heir. It would be singular if a power to consume the principal was left to be inferred from a clause like this which has manifestly a different object in view, and does not necessarily convey such implication.
Somewhat singular consequences would follow such a construction. Whether a ward’s realty shall be sold for his maintenance and education must depend upon his needs in those respects. It is natural to expect that the court charged with the duty of determining that question should also have authority to decree the sale.
The act of 1798 expressly directs the- Orphans’ Court to ascertain the amount to be annually expended in the maintenance and education of the orphan, and authorizes it to apply a part of the principal of the estate to those objects. If this authority, as to the sale of the real estate, is cut off by the act of 1843, the power of the court to fix the allowance at anything beyond the personalty and the income, is necessarily destroyed, because it is in the discretion of the *217 Equity Court whether the realty shall be sold or not. The power would then devolve on the Equity Court to determine the allowance of the ward. Could it have been intended to transfer to it this duty which is so exclusively appropriate to the Orphans’ Court? Or could it have been intended to leave with the Orphans’ Court the power to determine the ward’s allowance for maintenance and education, beyond the income of the estate, and yet require a separate and original, instead of an appellate and revisory proceeding, in the Equity Court, to give the orders of the former effect ?
All this difficulty makes it very improbable that Congress intended to transfer the administration of the ward’s property — in other words, the wardship of the infant — to the Equity Court, by the act of 1843.
In the case of an exactly similar act in Virginia, we have the authority of Rinker vs. Streit, 33 Grattan, 637, that it conveys no authority to apply the principal of the ward’s estate to his maintenance and education. If this be correct, as we- are inclined to think it is, then the object contemplated by the act of 1798, could not be obtained under the act of 1843, and the two acts must be held to have entirely different objects, and to be entirely compatible with each other; and, therefore, both must stand, according to the rule before stated.
But even if we can find, in the act of 1843, an implied power to sell for the express puiqiose of applying the proceeds to the maintenance and education of the ward, under the general authority to vest and apply for his benefit, it would not follow that the act is inconsistent with the act of 1798, and therefore repeals it. It would only follow that while the Orphans’ Court could only direct a sale of part of the realty for the single object of maintaining and educating, the Equity Court could decree a sale of the whole of it for the promotion of the ward’s interest in any way. There is no inconsistency in conferring on one court a jurisdiction which may include what already exists in another/without *218 intending to disturb the latter, but leaving tbeir jurisdiction, to a limited extent, concurrent.
The later law may be intended as a substitute for the former, although not positively inconsistent with it. But it must appear plainly to be so intended. And how can that be predicated of the act of 1843, when the supposed power of the Equity Court, intended to supersede that of the Orphans’ Court, is not expressed, and can only be made out, if at all, by doubtful implication P
We have seen that the Court of Appeals of Maryland, long after the act of Maryland of 1816 was passed, recognized this power of selling a ward’s realty as still residing in the Orphans’ Court, although by the effect of that act the proceeds of sale might be applied to maintenance and education, and, although, too, the more usual practice in that State probably was, to proceed under that act to secure such application.
If the act of 1816 in Maryland, did not work a repeal of the act of 1198, a fortiori did not our act .of 1843.
In the case of United States vs. Tynen, 11 Wall., 18, cited on .the part of the plaintiff, the Supreme Court found an absolute contradiction and repugnance between the two acts under consideration, so that they could not stand together.
In the case of Claflin vs. United States, 91 U. S., 546, the second act expressly repealed all acts which either conflicted with, or were supplied by the provisions of that act, and the Supreme Court held that the second act did supply the provisions of the first, and was plainly intended as a substitute for it.
We do not think, then, that the act of 1843 repealed that of 1198.
Such are the general considerations which lead us to hold that at the time of the proceeding in the Orphans' Court which was offered in evidence at the trial, that court had jurisdiction, on a proper showing, to order the sale of a part of the real estate of a ward for his maintenance and education. b
Another question, however, is made, going to the juris *219 diction in this particular case, which grows out of the nature of the estate owned by the wards.
It is said that they owned only a remainder, and that a contingent one, and the jurisdiction is denied in such a case, though it may exist as to estates in possession.
What estate then had the Thaw children under the will of their father P
After giving a life estate to the wife, he devised as follows, viz: “I give and bequeath to my two children above named, Columbia and Columbus, in equal parts, to their heirs and assigns forever, all my estate real and personal, that shall remain at and after the death of their mother, my said wife Eliza; or if either of them shall not survive their mother, then I will that the surviving one shall have the whole.
“Item. If both of my said children shall die before their mother, then, on the demise of the last survivor of them, I give and bequeath to my beloved wife Eliza, to her heirs and assigns forever, for her own proper benefit, all my estate of every description.”
A remainder is vested “ when there is a person in being who would have an immediate right to the possession of the lands upon the ceasing of the intermediate or precedent estate.”
“'It is the present capacity of taking effect in possession if the possession were to become vacant, that distinguishes a vested from a contingent remainder.” 4 Kent Comm., 194, 195.
But there was no moment after the death of Thaw, when each of his children would not have had an immediate right to the possession of a moiety of the property upon the death of their mother. The remainder of each had always a present capacity of taking effect in possession if the possession became vacant by the mother's death. It was, therefore, a vested remainder. Inasmuch as the devise to each child in remainder was in fee, the devise over his or her share in case of his or her death before the mother, to the surviving child, was simply an executory devise over of a fee after a *220 fee. Such also was the devise to the mother and her heirs in case she survived both children.
But the children had more than a vested remainder.
The first devise is to the mother, “to hold and enjoy during her natural life, in trust for the equal benefit and maintenance of herself and of my daughter Columbia and of my son Columbus, the two children above named; and if either of them shall die before arriving at the age of majority, then she is to hold the whole property as above for the equal benefit of herself and the survivor of the two above named children; or if both of the said children shall die before their mother, my said wife, then she, my said wife Eliza, shall hold the said property during her natural life for her own sole use and benefit, and in no case shall she, my beloved wife Eliza, be deprived of the use of any part thereof during her natural life for the maintenance of herself and the two children aforesaid, while they or either of them shall live, or of herself, if she shall survive them both.”
It will be observed that no active duties are required of the trustee, unless that is implied in the use of the word “ maintenance.”
But in a case where a tract of land was conveyed to a father in fee, to hold in trust for .children then alive, and to be born of his wife, to be equally divided, &c., and until the division to be occupied and used entirely and specially for the maintenance and support of the children, it was held that the legal estate vested in the children. McNish vs. Guerard, 4 Strob. Eq., 66.
The court said: “Ido not perceive in these words evidence that it must have been the intention of the grantor that the land was to be occupied or the rents received and disbursed by the trustee for the maintenance of the children. * * * A very strong persuasion certainly arises from the fact that the children were infants, and that the deed was made to their father with a direction for their support; that it was meant this support should be administered through him. But on the other hand, if the statute carried *221 the legal estate to the children, all this could be and must necessarily be attended to by guardians,” &c.
So that it is at least doubtful whether the children did not take a joint legal estate with their mother during her life.
But whether this be so or not, it is certain that they had the entire beneficial interest in the property, present and future, subject to their mother’s equal participation with them during' her life.
There might be serious objections to the sale of a mere remainder, because of the uncertainty of its value and the risk of sacrifice, but such objection would not apply to an estate like the above, where the mother unites in the sale of her interest, and thus the whole title passes and the full value is realized.
But there is nothing in the act of 1798 to limit the terms real estate or principal to estates in possession, or to exclude future interests from being sold equally with those in possession ; and in the case of statutes of other .States resembling ours, the contrary has been expressly decided. Baxter vs. Baxter, 62 Me., 543; Cooper vs. Hepburn, 15 Gratton, 563.
It has’been argued that the act of Congress of 1856, Rev. Stats. D. C., sec. 969, &c., provides for the sale of remainders and reversions in real estate, and thereby assumes that there was no existing provision on the subject.
The act in question provides for a sale of property limited for life, with contingent remainder over to issue of the tenant for life, who may be living at his death. It is the case of contingent remainders to uncertain persons who cannot be known until the expiration of the life estate. Of course, no such person could be before the Orphans’ Court asking through a guardian, for the sale of his interest, during the continuance of the life estate, an entirely different case from the present.
It is supposed that section 10 of sub-ch. 12 of the act of 1798 prohibits the sale of trust estates. • But we do not understand it as having any such meaning. The clause re *222 lied on is the last of the sub-chapter, and it is, “ that nothing in this act contained shall be construed to affect the general superintending power exercised by the Court of Chancery with respect to trusts.”
There are five sections between this and the one giving the power of sale, so that it cannot have any special reference to the latter. It is a proviso relating to everything in the act. It qualifies all of it. If it prevents a sale of equitable estates, it equally prevents the appointment of a guardian or the control of the natural or testamentar}' guardian wherever the ward’s estate consists of equitable property. Such, certainly, could not have been the intention. The idea could only have been to reserve to the Chancery Court its usual power of calling a trustee to account and enforcing the performance of his duties, which could be done in concurrence with the special powers of the Orphans’ Court with respect to guardians.
Apart from the statute, however, a question may be made as to the power of the Orphans’ Court to decree a sale of an equitable estate, when it cannot decree a conveyance by the trustee, so as to give a complete title to the purchaser.
I see no more reason to doubt the power of the court in this respect than to doubt its power to sell a remainder because it cannot compel the life tenant to join in the sale, or its power to decree a sale of an undivided interest, as was done in the G-oltier case, because the co-tenants could not be compelled to join in the sale or in a partition. In the last case, the purchaser could not get the full benefit of his purchase without a partition, voluntary or enforced by suit in equity. And so, the purchaser of an equitable estate would be entitled to demand a deed from the trustee and to enforce compliance by a suit in equity.
But no such question can arise in the present case, in which the guardian is the trustee and the very party seeking a sale.
Indeed, as it is clear that the trust in this case was purely personal to the children, it would cease, of itself, as an active trust, at the moment of the transfer of their title, *223 and tbe legal title would be transferred to the purchaser by operation of the Statute of Uses.
We think there was nothing in the nature of the estate to exclude the jurisdiction of the court to decree a sale.
The next question will be, what facts were necessary to give the court jurisdiction for this purpose?
Upon examining the statute, we find no other jurisdictional facts necessary than the ownership of the property by a minor and the existence of a guardian.
“Whenever land shall descend on or be devised to a male under the age of twenty-one years, or to a female under sixteen * *• * and such male or female shall not have a natural guardian or guardian appointed by last will, agreeably to the statute, the orphans’ court of the county where the land lies, &c., shall have power to appoint a guardian, &c. And the court shall also have power, on the application of any friend of the infant, &c., to call on any guardian under the statute aforesaid, or natural guardian, to give bond, &c.” On the execution of the bond the court may require the land, &c., of the ward to be delivered to him; may exact certain duties of him as to management and accounting; may, at its discretion, fix the yearly allowance of the ward for maintenance and education, and if it shall deem it advantageous to the ward, may allow the income to be exceeded, and order a sale of part of the principal.
It is not even made necessary to allege that tbe income is insufficient for his support. It may be . sufficient to maintain and educate according to a certain scale of living, and yet the court may, in its discretion, make a larger allowance and authorize a sale. The insufficiency of the income is an argument addressed to the sound discretion of the court. But if such insufficiency be a necessary fact, it appeared very explicitly in this case.
No particular form of application or allegation or proof is prescribed as necessary to give the court jurisdiction.
It is insufficient for the court, in however informal a manner, to be satisfied that a sale is advantageous to the *224 ward, with reference to his maintenance and education, and, as the Supreme Court say in Thompson vs. Tolime, 2 Pet., 157, “the law nowhere requires the court to enter upon record the evidence upon which they decided that fact.” And even if proof were required to be taken in a formal manner and recorded, the omission to do it would only be error and not go to the jurisdiction of the court to decree upon the case before it. House vs. Wiles, 12 Gill & J., 338.
A purchaser under such a decree is not bound to look beyond the decree, if it is such as the court had authority to pass upon the case presented. This has been so well settled by the Supreme Court as to require no argument. Doolittle’s lessee vs. Bryan, 14 How., 567; Gregnon’s lessee vs. Astor, 2 How., 343; Thompson vs. Tolime, 2 Pet., 169.
The proceeding in the Orphans’ Court is a proceeding in rem; is, in a sense, ex parte, and summary.
It must be remembered that an infant may contract for necessaries, for his maintenance and education, and in that way subject his property to legal proceedings by his creditors. Shall he be subjected to the costs and they to the delay of formal procedure at law or in equity, whenever it is necessary to satisfy his wants and their demands; or is it not better that some expeditious method be authorized of appropriating his property to his wants?
As Chancellor Bland says (Williams’ Case, p. 205): “An infant is, in general, incompetent to contract, but he may, by contract, bind himself for his maintenance and education; and hence a legislative enactment which facilitates such an application of his estate, co-operates with the infant’s legally qualified right to contract in discharge of a duty to himself without trenching upon any of his rights.”
This proceeding is not more summary than the one provided for partition by the Act of Descents of 1786. Under that act one of several heirs, including minors, may petition a county court for a partition of descended lands. A commission is issued ex parte. There is no summons, no guardian ad litem appointed to the minors, no answer from him or in his behalf. And yet, the partition may be decreed *225 on the report of the commissioners, and if they report it impossible, the land may be sold by them and the infant’s title extinguished, he having no say in the matter through a guardian ad litem, though his natural or testamentary or Orphans’ Court guardian may except or appeal and may be heard as to the terms of sale. An appeal is provided to the Court of Chancery, just as a review by that-court was provided in the case of the Orphans’ Court sale.
The difference was that the partition ordered by the County Court was good unless set aside by the Chancellor on appeal, whereas the Orphans’ Court order of sale was not operative until affirmatively approved by the Chancellor or general court.
In the one case the Superior Court had to reverse, in the other to concur.
In both cases the action of the Superior Court is revisory and' not original.
In the act of 1798, the law declares, in substance, that the Orphans’ Court may orden' a sale, but they shall not thereby diminish the realty without the approbation of the general court or Chancellor.
As the power to order a sale applies equally to realty and personalty, it is to be presumed that the proceeding in the Orphans’ Court, is intended to be the same as to both.
The action of the Orphans’ Court must precede that of the Chancellor, and it is this action which he is to approve. He is not to order or decree a sale, which would be the appropriate terms for an original proceeding before him, but is to approve, which term is only appropriate to a revisory proceeding. And as the statute clearly contemplates a previous decree by the Orphans’ Court, it must be this which is to receive his approbation.
It would be an extraordinary law which would allow the Orphans’ Court first to decree a sale and then require a formal suit to be instituted in chancery or in the general court, which was a common law court, covering precisely the same ground and prosecuted to a new decree. The natural query would be, why this superfluity of procedure ?
*226 The reference to the general court, too, excludes the idea of an original proceeding in the higher court, because that court having only7 common law jurisdiction, had no form of proceeding for the sale of realty, except the sale under common law execution.
If it be true that the action of the Chancellor is revisoryonly, then the ordinary formalities of an original suit in equity are not required.
The common law of the courts only knows of the removal of proceedings from inferior to higher courts, by appeal, writ of error, or certiorari, for the purpose of reversal, but nothing of a removal’for approval, and supplies no formula for the latter, which is a statutory proceeding.
The statute prescribes no formalities by which the Chancellor is to take cognizance of the proceedings in the Orphans’ Court, but it leaves that to be adjusted by the rules or practice of the courts.
And now as to the facts.
However imperfect the files and records of the Orphans’ and Circuit Courts were, we have no doubt that the evidence supplied from them was properly' admitted at the trial. The evidence in the record shows that the two infants before mentioned, Columbus and Columbia Thaw, derived title to the property in controversy uüder the will of their father; that Eliza Y. Thaw, their mother, bonded as their guardian on the 22d of March, 1844; that on the 29th of that month she filed her petition, showing that she had paid all the debts of her husband; that the property left by him was insufficient to support her and the children; that a part of it consisted of two vacant lots (the property in controversy), and praying that it be sold to relieve the immediate wants of the petitioner, and for the support and education of the children; that a decree for such sale was passed on the same day, which was afterwards approved in the Circuit Court on the 12th of October following; that a sale was made which was approved by the Circuit Court on the 21st day of January, 1848, and a conveyance made by Mrs. Thaw in pursuance of it on the 17th of March, 1848.
*227 As far as concerns the interest of the infants in the property. the court had before it everything which was necessary to give it jurisdiction to decree a sale.
It is true that the guardian, in her application, confused somewhat her own interests with those of the wards, and alleged the insufficiency of the property to support herself and the children as a ground for selling, and asked the sale as well to relieve her own immediate waMs as for the support of the children.
But it is fair to read this part of the application as referring to her own undivided interest for life in the property. It is not to be read as an application to sell the estate of the children for her support. It is also true that the court had no jurisdiction over the wife’s interest in the property, and could not pass title to it byits decree. But if the wife chose to unite in the sale and convey her interest, which she must be held to have done, we see no reason why the court could not decree a sale of the share of the infants as was done in the case of Baxter vs. Baxter, 62 Me., '540, in which the court said: “As after the decease of the father, the whole estate is‘in the children, a sale of the right of the children, with a conveyance from the father, would vest the whole estate in the purchaser.”
And if there was error in the form of the decrefe because it embraced the widow’s interest also, it did not affect its efficacy as to the interest of the infants, but was a harmless and inoperative error not to be noticed collaterally.
The only question that could arise would be as to the proper apportionment of the proceeds between the mother and the wards. But this question could only arise after the sale and would not affect the transfer of title.
Holding these views, it follows that one must hold that the court below correctly admitted the evidence as to the sale and conveyance under the authority of the Orphans’ Court, which is the evidence set out in the first three bills of exceptions.
The 4th bill of exceptions related to the admission in evidence of a deed of partition between the plaintiff and *228 his sister, in which he recites that his mother, after disposing of the real estate acquired by his father’s will and in-resting the proceeds in other real estate, died intestate, &c.
Prima facie this would seem to be an admission of the sale of the property in controversy by the mother, and an investment of the proceeds in the property then to be divided. As such, we see no error in receiving it, but it was in no sense an estoppel, and was open to explanation, which was given in the rebutting evidence.
The 5th bill of exceptions relates to the refusal of the court to grant five instructions, all of which, according to the views before expressed, were erroneous and were rightly refused.
The last bill of exceptions is peculiar. It shows that two instructions were asked on behalf of the defendant, both of which were granted against the plaintiff’s objection, and at the same time the justice stated that there was no substantial disagreement between the parties as to the facts, and that he held that the plaintiff could not prevail against the title which the defendant furnished, and instructed the jury to find for the defendant, to which the plaintiff e'xcepted. It does not appear whether the exception was to the granting of the instructions prayed, or to the statement that there was no disagreement as to facts, or the instruction that the plaintiff could not prevail against the title furnished by the defendant, or the final peremptory instruction to find for defendant.
We are not bound to notice this exception, and there is less occasion for it, because after the previous ruling below, which we have sustained, it could do no harm if technically erroneous.
The motion for a new trial is overruled.
Mr. Justice Haghíer dissented.