FEBRUARY TERM, 1906. 133

*1 Buch.* McNab & Harlin Mfg. Co. *v.* Paterson Building Co.

McNab & Harlin Manufacturing Company

*v.*

The Paterson Building Company et al.

[Decided April 28th, 1906.]

1. Under section 3 of the Mechanics' Lien law of 1898 a subcontractor furnishing for a building, in process of erection, an apparatus for opening and closing windows, making a lump charge for the apparatus installed, is entitled to the remedy by stop notice, the claim being regarded as growing out of materials furnished *in situ.*

2. Such section should be liberally construed, both as to the lienability of the debt and the sufficiency of the stop notice.

3. A stop notice which states that the material was sold to the contractor for the building, but does not expressly allege that it was actually used in the building, is, nevertheless, sufficient.

4. The "notice in writing" prescribed by section 3 of a lienable debt for material used in the building consisted of three papers, as follows: (1) An order by the builder on the owner in favor of the claimant for $540. (2) An assignment executed by the builder under an erroneous but not misleading name, purporting to transfer to the claimant, out of the moneys due or to become due to the builder from the owner, $540.52 for work done and materials furnished by the claimant to the builder, and used by the builder in the erection of the building. (3) A notice addressed to the owner, signed by the claimant, setting forth the amount of the debt, the demand, the refusal and the notice to retain and pay, but apparently by a clerical error omitting to disclose for what the debt had been contracted. The notice stated that the debt was due to the claimant from the builder, but described such debt as $540.52, "by you, the said owner, used and employed in the erecting," &c.—*Held*, that all the papers together constituted a sufficient "notice in writing," under section 3.

5. A subcontractor engaged to excavate a cellar for a building, and who does so with his teams and laborers, is not a laborer employed by a contractor, within the meaning of section 3 of the Mechanics' Lien act of 1898, and is not entitled to the remedy by stop notice.

On bill of interpleader. On final hearing upon statements of defendants of the grounds of their several claims to liens by stop notices under section 3 of the Mechanics' Lien law.

*Mr. Jacob Willard De Yoe,* for George A. Meyers & Company.

*Messrs. Ward & McGinnis,* for the Mehrhoff Brick Company.

*Mr. Peter Bentley* and *Mr. James F. Fielder,* for Collins, Lavery & Company.

*Mr. Hugh McQuillan,* for Martin Goble and for Cyril R. Forbes.

*Mr. Michael Dunn,* for Cornelius J. Gallagher.

*Mr. Wood McKee,* for James Radcliff & Sons.

*Mr. James G. Blauvelt,* for the G. Drouve Company.

*Mr. William B. Gourley,* for Joseph R. Graham.

*Mr. Edward F. Merrey,* for Thomas F. McCran, receiver of the Paterson Building Company.

STEVENSON, V. C.

After the fund ($5,027.97) had been paid into court in pursuance of the decree of interpleader, the ten defendants filed their respective "concise statements," setting forth the grounds of their respective claims in accordance with the practice established by rule 221. The litigation thus set in court was brought to a final hearing on June 8th and 9th, 1905. After the testimony had been taken and counsel had been heard in regard to each claim, I announced orally my conclusions, setting forth in each case the reasons why the claim was either allowed in its place as a lien against the fund or rejected. Four of the claims were disallowed under the rules laid down or followed by me in the case of *Beckhard* v. *Rudolph, 59 Atl. Rep. 253* (decided June, 1904). Inasmuch as this *Beckhard Case* was then pending on appeal in the court of errors and appeals, I announced that the final decree in the present case would be withheld until the *Beckhard Case* had been decided in the court of last resort, and that if such decision reversed or modified the decree of this

FEBRUARY TERM, 1906. 135

*1 Buch.* McNab & Harlin Mfg. Co. *v.* Paterson Building Co.

court a further hearing, then, would be had herein. The court of errors and appeals having reversed the decree advised by me in the *Beckhard Case,* all of the defendants were duly brought into court on notice of the settlement of the decree "in accordance with the decision of the court of chancery already announced in this case and the decision of the court of errors and appeals" in the *Beckhard Case.* Inasmuch as neither the testimony nor the conclusions announced by me have been written out by the stenographer, I shall not undertake to set forth the grounds on which any claims are either rejected or allowed, excepting in the four cases above mentioned, viz., the respective cases of the G. Drouve Company, Martin Goble, Collins, Lavery & Company and Cornelius J. Gallagher. In regard to each of these four claims, all of which were disallowed, it has been argued that the decision of the court of errors and appeals in the *Beckhard Case,* or the opinion of that court formulated by Mr. Justice Pitney, compels its allowance. As to the other six claims, which embrace five alleged liens by stop notice, and the claim of the receiver of the corporation which erected the building under the contract on file, no insistment is made that the decision of the court of errors and appeals in the *Beckhard Case* can possibly lead to a different result in any instance. Two of these five claims on stop notice were allowed and the remaining three were disallowed. In case an appeal should be taken from the decision of this court as to any one of these six claims, a brief additional opinion will be filed.

I am unable to distinguish the claim of the G. Drouve Company from the claim of Adamson & Son, which was sustained by the court of errors and appeals in *Beckhard* v. *Rudolph.* The claim of Adamson & Son was for the amount due for the plumbing which they had put into the building in pursuance of a subcontract. They supplied the materials and performed the labor, and the elements of labor and materials in fact entered about equally into the total charge. The total charge, however, was a single sum for the entire contract. The court of errors and appeals decided that Adamson & Son were "materialmen," who had "furnished materials used in the erection" of Mr. Beckhard's building, and that the amount claimed by them in their notice

to be due for "work done and materials furnished" in fact was due "for materials furnished *in situ,*" and that therefore they could acquire a lien by a stop notice under section 3 of the Mechanics' Lien law.

In the present case, the G. Drouve Company had a similar subcontract for the incorporation into the building of a system of bars or levers called the "Lovell apparatus," a device for opening and closing windows. The total charge was $1,373.70. Although, as in the case of Adamson & Son, this total charge was in no way divided so as to indicate how much of it was for labor and how much of it was for material, it was evident that a very large portion of the charge represented the value of the apparatus or finished parts of the apparatus delivered at the building, all of which was material—raw material, so far as the building operations were concerned—and plainly lienable.

If any distinction could be drawn between the notice which was deemed sufficient by the court of errors and appeals in the case of Adamson & Son and the notice served by the G. Drouve Company, the latter seems to follow the statute more closely than the former. The Adamson notice states that the material was furnished for the *remodeling* of the building, as well as in the erection and alteration thereof, whereas the notice in the Drouve case strictly adheres to the statutory language.

My conclusion is that it would be entirely unnecessary to discuss the principles enunciated by the court of errors and appeals, or inferable from the decision of that court, in the *Beckhard Case,* in order to determine the status of this claim of the G. Drouve Company. The lienability of the debt by stop notice and the sufficiency of the notice are directly and necessarily established by this decision, which deals with substantially a parallel state of facts. My original ruling will therefore be changed, and the claim will be allowed in its place as a lien.

In each of the other three cases now to be considered we have a different state of facts from that which was presented to the court of errors and appeals on behalf of Adamson & Son in the case of *Beckhard* v. *Rudolph.* In order to determine these three cases, I think it is necessary to ascertain and follow not only the principles which are distinctly announced in the opinion of

the court in the *Beckhard Case,* but also some of the principles which necessarily underlie the decision in that case. If I had taken time to set forth the fundamental rule of construction which I applied in the *Beckhard Case,* the court of last resort would perhaps have been led to make a deliverance which would have rendered a large part of the present discussion entirely unnecessary.

The questions to be discussed when perhaps narrowly defined are these—*first,* whether section 3 of the Mechanics' Lien act is to be strictly or liberally construed so far as that section may give a lien to persons who are not journeymen or laborers, or, in other words, are not wage-earners, and *second,* whether, after the lienability of the debt has been established, a strict or liberal construction is to be placed upon the provisions of the statute which regulate the fastening of the debt as a lien on the fund by service of a notice in writing.

Fortunately it is not necessary to consider the broad question whether the Mechanics' Lien law generally should be construed strictly or liberally, if indeed any such broad question is capable of accurate statement or intelligent discussion. For various methods of treating this subject and for illustrations of the "hopeless division of opinion" in regard to it, the following text-writers may be referred to, with the judicial decisions which they cite: *Boisot Mech. L. (1897)* § *34; Phil. Mech. L.* § *16; 2 Jones L. (2d ed.)* § *1556; 20 Am. & Eng. Encycl. L. (2d ed.) 277, 278.*

What we are endeavoring to discover in this case is the true meaning of a few words in our New Jersey statute, the construction of which, to a large extent, may be determined without affecting rights and remedies which are unrelated to each other or do not naturally stand in the same class.

The New Jersey Mechanics' Lien law creates several radically different kinds of liens, and oftentimes a construction placed upon the statute in a case involving one kind of lien is equally applicable to cases involving an entirely different kind of lien. One lien may be of a character to induce the court to endeavor to sustain it by a liberal construction, whereas another lien may

be of such a kind as to induce the court to exclude it, if possible, by a strict construction.

The elemental mechanics' lien no doubt is of the kind which was created by the first Mechanics' Lien law ever enacted in this country—the statute passed by the State of Maryland in 1791 "concerning the territory of Columbia and the city of Washington." *Md. L. 1791, ch. 45, ¶ X.* This original Mechanics' Lien law was created expressly "for the encouragement of master builders to undertake the building" of houses in the projected city of Washington, and the lien was confined so as to secure only debts which were owed by the owner of the property subjected to the lien. Precisely the same limitation of the scope of the lien appears in the first statute establishing a mechanics' lien in any of the states. *Pa. L. 1803 p. 591.* This Pennsylvania statute is the origin of all our New Jersey legislation. Its title is substantially the same as that of our present statute. This first Pennsylvania law, like the original Mechanics' Lien laws of New York and New Jersey, was applicable to a narrow locality, and it was also limited to a period of less than four years. Shortly before the statute would have expired by its own limitation it was repealed and substituted by another statute having substantially the same title. *Pa. L. 1806 p. 480.* The new statute was narrowed in its application so as to include within its operation only the city of Philadelphia, but the debts which it undertook to secure by a lien included large numbers of claims for labor or materials for which the owner of the building charged with the lien would in no way be personally liable. The statute contained no provision for limiting the lien to the owner's creditors by filing the contract.

Here we have the origin of the lien which is charged upon the property of one man to pay another man's debts. This is the statute which first imposed upon the owners of real estate who desire to improve their property, and to make contracts for the erection of buildings thereon, the onerous task of discovering who the creditors of their contractors are, and then seeing that their claims are satisfied so far as they have arisen from the furnishing of labor or material to the erection of the owner's buildings.

The slightest reflection will show how widely these two liens, created by precisely the same language, differ from each other in respect of their essential nature and their respective claims to favorable consideration from courts of justice. The first lien, the elemental mechanics' lien, is little more than an extension of the common law lien afforded to large numbers of purveyors of labor and materials who add value to chattels under contract with the owner thereof. The second lien, arbitrarily granted to the contractor or materialman between whom and the owner there is no privity whatever, so far as I am aware, has no analogy in the common law, and stands in many respects directly in conflict with fundamental principles of justice. There are grounds for claiming, as recited in the original Maryland statute of 1791, that a mechanics' lien, for the protection of the party with whom the owner of the building contracts, encourages the erection of buildings, but it would seem that the extension of this lien to the protection of the creditors of the party with whom the owner contracts must oftentimes have the effect to discourage the erection of buildings.

When we come to the lien by stop notice, which attaches not to the building, but to the fund in the owner's hands and due from him to the contractor, we perceive two liens having different historical origins and differing widely from each other in a very important particular. One of these liens is that which the "journeyman or laborer employed by the contractor" enjoys for the better securing of the wages which he has earned. The general policy of the law may be considered to favor and prefer the claims of all wage-earners, whether on sea or on land. Our statutory law abounds with illustrations of this policy. Few landowners who erect buildings would contemplate with satisfaction the loss of any wages by the workmen employed on their buildings, whether they personally were in any way obligated to pay such wages or not. Large numbers of such owners of real estate would cheerfully exert themselves to see that the wage-earners employed by the contractors had received their dues. But there is no rule or principle of law and no general policy or theory recognized by law, apart from mechanics' lien statutes, which specially favors the collection of debts due to contractors

and merchants merely because such debts have been created in the erection of buildings whose owners are not liable for such debts. Such a policy is the pure creation of an arbitrary statute and does not seem to have any ethical basis, nor can I perceive how the lien to the materialman by stop notice can be deemed to encourage the erection of buildings.

But without pursuing this subject further at present, what I desire to point out is that at the present time, under our Mechanics' Lien law, there may be created two widely different kinds of lien upon the land, and also two widely different kinds of lien upon any fund in the hands of the owner and due from him to the contractor. An examination of our peculiar American legislation on the subject of mechanics' liens from the start shows how radically these four liens differ in their nature and in their origin, and here we find the first reason why the reported cases are so at variance in regard to the spirit in which the Mechanics' Lien law should be construed.

Any consistent theory or rule of construction of our present Mechanics' Lien law, as a whole, is also rendered difficult from the way in which that law has been created. As in the case of the other adjacent states, the origin of our statute is in a special law applicable to a limited territory. *P. L. 1820 p. 124.* This statute, then, from time to time was extended to other localities until, as revised in 1846, it included in its scope a very considerable portion of the state. *Revision of 1846 p. 743 § 3.* Still later the statute was extended to the entire state (*P. L. 1851 p. 187*), and finally, in 1853, a new Mechanics' Lien law was enacted for the entire state, which new statute was, to a large extent, constructed out of the heterogeneous materials which composed the prior statutes. *P. L. 1853 p. 437.*

The question whether the Mechanics' Lien law as it now stands, containing, as it does, without substantial change of phraseology, the main provisions of the prior laws, should be strictly or liberally construed, is further made difficult by the fact that from time to time special interests have exerted an influence with the legislature so as to bring them within the beneficial operation of the statute. I am not aware that any commissioners or revisers have ever undertaken to draft a com-

plete Mechanics' Lien law, based upon any definite and consistent legal or equitable principles.

Before reverting to the narrow question whether the statute, so far as it creates the lien by stop notice in favor of a debt of a materialman or a contractor—any debt other than for wages—should be strictly or liberally construed, it may be well to glance at the history of our New Jersey legislation. The first New Jersey statute above referred to, passed in 1820, applied to a small tract of land in the county of Gloucester, which one Edward Sharp desired to lay out in building lots and develop into a town or city. The title and main provisions of this act were copied from the Pennsylvania act of 1806, and are substantially continued in our present statute. In order, however, to cut off the grossly inequitable lien which under the general terms of the act borrowed from the Pennsylvania statute was conferred upon the parties to whom the owner of the building was in no way indebted, substantially the same provision was inserted which is now embodied in section 2 of our present act, to the effect that the filing of the contract should confine the lien to the contractor alone. If we may apply the principle that men and women, however ignorant, are presumed to know the law, the scheme of this statute as a whole might not be open to criticism, although in fact the provision for filing the contract has in large numbers of cases failed to protect the poor and the ignorant against a harsh and inequitable lien. It is plain, however, that the continuous policy of New Jersey has been to permit the owner of the building, who does not buy the materials or employ the labor used in its erection, a simple and comparatively inexpensive means for confining the liability of his property to lien to those persons with whom he contracts.

The act of 1820 made no provision for any lien by stop notice. This lien first appears in the act of 1835, which related to two townships in Hunterdon and Burlington counties, respectively. *P. L. 1835 p. 148.* Section 3 of this statute, as printed (at *p. 150*), provides for a lien by stop notice in favor of any journeyman or laborer employed by "any master or workman" to secure "wages" due to such journeyman or laborer, and the somewhat clumsy phraseology of this statute has been largely embodied in

our present enactment. The phrase "master or workman," if used in the act of 1835, was changed to "master workman" in the revised law of 1846. *Revision of 1846 p. 743 § 3.* This lien by stop notice, originally, was not confined to the case where the journeyman or laborer employed by the contractor was cut off from a lien on the land by the filing of the written contract. When no contract was on file the journeyman or laborer had both liens—the ordinary lien on the building and also the lien on the fund by stop notice. There are *dicta* in all our courts which assume that this workman's lien by stop notice, like the lien of the materialman, is now confined to the case where the owner's contract has been filed, but the point is not discussed in the cases, and the amendatory legislation which effected such a change is not indicated. *Weaver* v. *Atlantic Roofing Co., 57 N. J. Eq. (12 Dick.) 547, 550; Frank* v. *Freeholders, 39 N. J. Law (10 Vr.) 347, 350, 353 (1897)* ; *Beckhard* v. *Rudolph, supra.* It may be that it will be held that all doubts in regard to this matter were removed by the changes of phraseology made in section 3 in the amended law of 1898.

The lien of the materialman by stop notice, from the start, has been confined to the case where he is cut off from filing a lien against the building by the filing of the contract between the contractor and the owner. *Summerman* v. *Knowles, 33 N. J. Law (4 Vr.) 202.* It does not seem to me that it is correct to hold that the lien by stop notice is given to the materialman because of any hardship inflicted upon him by the filing of the contract. The provision cutting off his lien upon the building by the filing of the contract is manifestly intended to prevent the gross hardship of imposing upon the owner a lien for a debt which he does not owe. The materialman, observing that the wage-earner had two liens under the statute, one of which was not affected by the filing of the contract, while he (the material-man) had only one lien, which was cut off by the filing of the contract, secured from the legislature the advantage of the wage-earner's second lien, the lien by stop notice; but the legislature declined to give the materialman this lien by stop notice in case he could avail himself of his lien upon the building. Why the legislature saw fit to give this lien by stop notice to the

materialman in any case, I have never been able to discover. Why the merchant who sells nails, or brick, or lumber, or other merchandise, should be permitted, in the event of his merchandise being incorporated into a building, to have a preference over the other creditors of his customer, is, I think, somewhat difficult to discern. He has no such preference if the customer to whom he sells the merchandise on credit incorporated that merchandise into personal property. But what reason, founded in sound morals or the just protection of trade, can be imagined for permitting this particular class of dealers in the market to compel their debtor's debtor to come into their business affairs and see that their debt is paid? The unfortunate owner of real estate who has erected a building, in many cases like this, where large numbers of notices are served, is obliged to employ counsel, is made liable to actions at law, and oftentimes has difficulty and meets with expense which is not repaid to him, in coming into a court of equity on a bill of interpleader for relief, in order to disentangle himself from the business affairs and pecuniary demands of various traders with whom he has had no dealings, and to whom he owes no duty whatever excepting such as has been created by this arbitrary statute. This sort of legislation has been criticised as vicious class legislation. Such criticism may be deemed excessive, and even intemperate, and I am not obliged to adopt it, or, to use the language of Chief-Justice Green, to manifest a "design of impugning the wisdom or policy of the law." *Ayres* v. *Revere, 25 N. J. Law (1 Dutch.) 474, 481.* I did, however, adopt the view, in the case of *Beckhard* v. *Rudolph,* that every dealer in merchandise who sells on credit, before he is allowed to claim this special advantage over other dealers and other creditors in the market, and to impose upon strangers the difficult and oftentimes expensive burden of seeing that his particular debt is paid, was bound to bring his case strictly within the words of the statute, and was then obliged to pursue the statute strictly in order to fasten his lien upon the fund. It should be observed that the rule of construction which we are endeavoring to settle is not applicable to the lien by stop notice which the statute affords to the wage-earner. Oftentimes the construction of section 1,

creating the lien on the land and building, applies equally to debts due from the owner which are within the original policy of the Mechanics' Lien law, and to debts which the owner does not owe and the liens for which he is permitted to cut off by filing his contract. See *Ayres* v. *Revere, supra.*

So, also, a construction placed upon section 3 may equally affect the lien of the poor wage-earner and the lien of the rich merchant or contractor.

In the present instance, however, we have to deal with the question of the lien by stop notice, provided by the statute for different classes of creditors of the contractor who are strangers to the owner, but who are not wage-earners. The fundamental principle applied by me in deciding the *Beckhard Case* undoubtedly was that subcontractors like Messrs. Adamson & Son were not entitled to a liberal construction of that portion of section 3 which creates a privileged class of dealers who are not wage-earners, and imposes for their benefit special burdens upon the owners of real estate. This whole view, I think, must now be deemed entirely erroneous since the decision and opinion of the court of errors and appeals in the *Beckhard Case.* It is true that the court of errors and appeals did not discuss the question whether the provision of the Mechanics' Lien law under examination should be strictly construed or liberally construed, but it seems to me that a ruling in favor of a liberal construction is necessarily implied both in the deliverances which the court made and in the decision which the court rendered. The construction placed upon the statute by this court was rejected as arising from "too narrow a reading of the letter of the section," and because it failed "to give due effect to the spirit of the act and to the antithesis that exists between the first and third sections." The legislative intent to give the materialman a lien upon the fund as a substitute for the lien upon the building of which he is deprived by the filing of the contract is recognized and carried into effect not merely within the limits expressly prescribed by the phraseology of the statute, but in accordance with its general purpose and spirit. That the legislature of this state had continuously for years favored the lien of the material-

man by stop notice is quite apparent. It lost no time after the publication of the decision of this court of the *Beckhard Case* in extending this lien to every class of subcontractors, including subcontractors who supply labor alone. *P. L. 1905 p. 311.* Whether, since this recent amendment of section 3, subcontractors like the Messrs. Adamson & Son can take their choice either to give notice of their lien as materialmen or to give notice of it as subcontractors perhaps is a debatable question.

The policy of the legislature to favor the materialman to the disadvantage of the owners of land who erect buildings thereon has recently been considerably extended. No backward step has been taken. Sections 5 and 6 of our present act, which embrace recent amendments, interfere with and greatly impair the natural common-law right of the owner and the builder to modify their contract so as to subserve the convenience of the two contracting parties, even though without such modification the carrying out of the contract may become practically impossible. These sections evince a most positive intention on the part of the legislature to foster and extend the lien by stop notice, although it must be observed that these provisions apply to the wage-earners' lien as well as to the lien of the materialman. The unfortunate owner who has filed his contract specifying the time and manner in which the contract price is to be paid is made a sort of involuntary trustee in respect of the moneys which the contractor may earn for the benefit of a favored class of the contractor's creditors, and to enable these creditors who are strangers to him to collect their debts, the owner and the builder are prevented from altering their contract for the accomplishment of their own honest business purposes.

The legislature of the state having thus distinctly manifested a policy in favor of the lien by stop notice, which policy has been changed only by expansion, I think that the court of errors and appeals by this last decision establish the doctrine that the courts of the state are bound to give a full and fair effect to this legislative policy, so far as established rules of construction will permit. It is safe, I think now, to hold that all parties whose liens on the land are cut off by the filing of the contract are entitled to a liberal construction of the statute, so as to give

10

them a lien on the contract price in the owner's hands by stop notice.

It follows necessarily from this liberal rule of construction, by which the lienability of a debt by a stop notice is to be determined, that a correspondingly liberal construction should be placed upon the requirements in respect of the notice. Heretofore it has commonly been said that the holder of a lienable claim by stop notice must strictly pursue the statute or he would lose his lien. *Superintendent* v. *Heath, 15 N. J. Eq. (2 McCart.) 22, 26 (1862).* This proposition often has been stated in cases like the one last cited, where no question arose as to what the requirements of the statute were. The general principle is laid down by many authorities that the provisions of a Mechanics' Lien law which "relate solely to the manner of enforcing the lien already given" are remedial, and hence should be liberally construed, while those parts of the law "upon which the right to the existence to a lien depends" should be strictly construed. *20 Am. & Eng. Encycl. L. (2d ed.) 278.* Certainly it must follow *a fortiori* that a liberal construction of that part of the statute which creates the lien leads to a similar construction of that part of the statute which regulates the enforcement of the lien, unless the provisions relating to enforcement apply also to some other lien besides the favored lien. In the present instance it is plain that the lien of the wage-earner is entitled to as much favor as the lien of the materialman, especially if, under the amended act of 1898, the wage-earner's lien by stop notice exists only when the contract has been filed.

Messrs. Adamson & Son had a lienable debt by stop notice, according to this decision of our court of last resort. Messrs. Adamson & Son plainly were not "journeymen or laborers" employed by the contractor. They were adjudged entitled to a lien as materialmen. They are held to be persons who "have furnished materials used in the erection" of Mr. Beckhard's building. They could not have any lien for work done. The performance of their subcontract for the installation of the plumbing in Mr. Beckhard's house is deemed the supplying of materials *in situ,* and the contract price is the price of materials so installed. This is the perfectly plain theory of the decision

of the court of errors and appeals.  And yet the notice which Messrs. Adamson & Son gave to the owner of the building stated most distinctly in two places that their debt was due to them for *labor* as well as for materials.  It is evident that precisely this same notice might have been given by an architect or an engineer, or any employe of a subcontractor who held an accepted order for the amount due to him from the principal contractor, provided this person thus having a claim for labor against the principal contractor which was not lienable by stop notice had happened to sell such principal contractor some material for which a lien by stop notice could be acquired.  The notice, however, which Messrs. Adamson & Son employed did in fact, in their case, describe a debt which the court of errors and appeals held to be lienable.  It would seem to follow that where the debt is in fact lienable, the notice must not be deemed insufficient because it describes a debt which may or may not be lienable.

The opinion of the court of errors and appeals in the *Beckhard Case* does not deal with the objection to the notice of Messrs. Adamson & Son which I endeavored to point out in my opinion, and which assumed that the debt in question for plumbing work was lienable by stop notice.  The learned justice who wrote the opinion may have been misled by an erroneous syllabus published in the advance sheets of the "Atlantic Reporter," which was corrected in the permanent edition.  *59 Atl. Rep. 233* ¶ *3* of syllabus.  The fact, however, that the opinion of the court overlooked the objection to this stop notice which led me to deem it invalid, even after assuming that the debt which it described in fact was lienable, is not a matter of any consequence.  This notice of these materialmen, Messrs. Adamson & Son, was before the court, and the court unanimously held that a materialman's notice which described his debt as due for work done, as well as for material furnished, was a sufficient notice where in fact the work done had been so connected with the furnishing of the materials that the whole transaction could properly be deemed within the meaning of the statute, the furnishing of materials *in situ.*  The owner is not allowed to disregard such a notice from a materialman merely because it appears to claim a lien not only for material, but also for work done.  The owner must

look into the facts and ascertain whether the party who serves such a notice is or is not in fact a materialman—has or has not a claim for work done and materials furnished in such a way that the whole amounts to a claim for "materials furnished *in situ.*"

Precisely what are the requirements of the notice to the owner when the debt of the claimant is in fact lienable by stop notice under section 3 I am unable, with certainty, to ascertain. The statute describes a certain situation in which certain parties are placed which involves a "refusal" by one to pay money to the other. In order that the lien by stop notice may be fixed on the fund, notice must be given "of *such* refusal and of the amount due * * * and so demanded." If the notice were required to be merely "of *such* refusal," it seems plain that the statute could not be strictly complied with unless the notice set forth all the necessary facts and conditions under which the refusal was made. A very strict construction would even require that the notice, when given by a materialman, however it may now be in the case of a journeyman or laborer, should state that the contract was on file. The express requirement, however, that the notice shall set forth the refusal and "the amount due and so demanded" certainly founds a forcible argument, based on the maxim *expressio unius est exclusio alterius,* that all the other essential facts and conditions which must precede the refusal in order to the establishment of the lien need not be set forth in the notice. When the general principle is established that the legislative policy is to favor the lien by stop notice under section 3 on behalf of all parties who would have liens under section 1 if the contract were not filed, it seems that a correspondingly favorable construction of the provisions of the statute defining the notice might properly lead to this result, that if the notice states the two things which the statute expressly prescribes, viz., that there has been (1) a refusal to pay (2) a certain specified sum of money, the sufficiency of the notice in respect of all other matters depends upon whether or not it fairly apprises the owner to whom it is given that the party giving the notice claims to have a lienable debt for the amount stated, and that the notice is given to establish the lien. The notice is not a pleading. Its

object is to put the party upon whom it is served upon the inquiry, and to inform him that a claim is made against him which he must investigate for the benefit of the party giving the notice. One of the burdens of the owner is that he must investigate and satisfy himself of the lienable nature of the claim and of the "correctness" of the demand which is made upon him. These notices are often drawn by business men who are unacquainted with legal forms. Upon the general theory, which we are now adopting, it seems to me there is ground for the argument that the notice need not contain things which the owner already knows. The sufficiency of a notice often depends on the question whether the party to whom it is given has or has not knowledge of certain other facts which are not stated in the notice. In the consideration of this matter regard may be had to the fact that it has never been held that the notice of the materialman should set forth that the contract between the owner and the builder has been filed, and yet this fact lies at the very foundation of the lien. *Corbin's Forms 509.* The owner, however, presumably is aware of this fact, and the written paper served upon him would not be in the slightest degree more efficient as a notice if it set it forth.

I shall not, however, undertake to formulate any rule defining the exact requirements of a stop notice where the debt is lienable as a matter of fact under section 3. What I have said is intended merely to indicate a general principle which may to a certain extent guide me in testing the sufficiency of the stop notices to be examined in this case. These notices can, I think, be tested by comparing them with the notice which in the case of Messrs. Adamson & Son has been established as sufficient, with the aid of the general principle that where the debt is lienable by stop notice and the stop notice specifies the two matters expressly prescribed by the statute, and the owner in fact did get notice by it that the party giving it claimed a lienable debt which it was intended to establish, the court should make every possible effort to sustain it.

The above conclusion, I think, is strengthened by the adjudication in the *Beckhard Case* that the notice need not expressly state that the debt had been demanded. The statute only gives

a lien where there has been a refusal "upon demand," which phraseology, if not tautological, seems to imply that there may be a refusal not upon demand—a refusal which anticipates or excludes a demand. The statute also, in expressly prescribing the contents of the notice, specifies that it must exhibit both the refusal and the amount *demanded.* This express mandate, when construed with strictness, requires that the notice shall set forth merely (1) the refusal and (2) the amount. It must set forth the amount *due* to the complainant and *so demanded,* but, after all, strictly, it is only the amount which the statute requires to be set forth. If the amount so set forth is subsequently proved in fact to have been due to the complainant and to have been demanded by him, the notice may be deemed to comply with the statute. A strict construction of the statute may thus be resorted to in order to sustain the notice of a lienable claim, but not to defeat such notice.

With the above principles in view, we may now proceed to consider the claim of Martin Goble. The claim, as proved, is for material, plainly lienable under section 3. I excluded the claim on the ground that the notice was defective in that it did not set forth that the material had been "used" in the erection of the building. The notice states that the claimant has "sold to the Paterson Building Company, for 'the building of the McNab & Harlin Mfg. Co.,' on Straight street, Paterson, N. J., material to the amount of two hundred and thirty-four dollars and two cents," &c. The demand and the refusal are set forth and the owner is notified to retain the amount due and pay it, after satisfying itself that the claim is correct. It is plain that this notice describes a claim which might be lienable. It contains the two things which the statute expressly requires to be inserted therein, viz., the amount due and the refusal of the corporation to pay that amount. The owner who received this notice was put on the inquiry. It is true that upon all the facts being ascertained by the owner or subsequently proved in a court of law or a court of equity, it might be made to appear that the material sold by Mr. Goble to the builder *for* the building which the owner was erecting had not in fact been used in that building and the lien would then be defeated. This, however, is a matter of proof. No doubt if the notice must be

treated as a pleading the omission of the essential fact that the materials had been used in the building is fatal. But having in view the function of the notice above set forth as an instrument to put the owner upon the inquiry, I think this notice should be deemed sufficient. It seems to me that it comes as near to a strict compliance with the statute as the notice of Messrs. Adamson & Son in the *Beckhard Case.* Messrs. Adamson & Son gave notice that their debt was due, not only for materials furnished, but for work done. In fact they could have no lien whatever for work done, but only for materials furnished. The notice was served because the proof showed that while the debt was incurred in part for work done, such work was in contemplation of law so associated with the furnishing of materials that the entire claim for work done and materials furnished in fact stood for the furnishing of materials *in situ.* I may be in error, but I feel constrained to change my ruling in the case of Mr. Goble and allow his claim.

We next take up the claim of Collins, Lavery & Company, which was for lumber furnished to the contractor and used in the building. What Collins, Lavery & Company furnished was raw material, *i. e.,* material which the contractor received and by his labor incorporated into the building. Collins, Lavery & Company had nothing whatever to do with the attaching of the materials which they furnished to the building as part thereof. They did not furnish the material *in situ.* There was no question about the lienability of the debt under section 3. The claim was disallowed by me because I deemed that the notice was insufficient. The "notice in writing," in this instance, consists of three papers. Only one is set forth in the "statement" presenting the claim, but the other two papers were proved without objection, and the question argued was whether these papers, as a whole, satisfied the requirements of the statute. The "concise statement" of Collins, Lavery & Company may therefore be amended so as to set forth all three of these papers, or at least two of them.

The first paper is an order by the Paterson Building Company on the McNab & Harlin Manufacturing Company in favor of Collins, Lavery & Company for the sum of $540. This order was delivered, but not accepted.

The second paper is an assignment which erroneously describes the party making such assignment as "Hugh Montague, Joseph J. Rooney and Dennis J. Bergen, trading as and under the firm name of the Paterson Building Company." This paper is executed by the "Paterson Building Company, by J. J. Rooney, Treas." It was drawn by the attorney of Collins, Lavery & Company under the mistaken impression that the Paterson Building Company was a partnership. The persons named as partners were the officers of the corporation. The assignment undertakes to transfer to Collins, Lavery & Company, "out of the moneys now due and owing, or hereafter to become due and owing," to the assignors "from McNab & Harlin Mfg. Co. for work done and materials furnished by the said Collins, Lavery & Co." to the assignors, and by the assignors "used in the erection and construction of a certain building for the said McNab & Harlin Mfg. Co., of Paterson, New Jersey, the sum of five hundred and forty dollars and fifty-two cents."

The third paper reads as follows:

"*To McNab & Harlin Manufacturing Company, owner of the building known as Nos. 368 to 378 Straight street, in the city of Paterson and State of New Jersey:*

"Take notice, that there is due to us, Collins, Lavery & Company, from Hugh Montague, Joseph J. Rooney and Dennis A. Bergen, partners trading as the Paterson Building Company, the sum of five hundred forty dollars and fifty-two cents, by you, the said owner, used and employed in the erecting and constructing of your said building; that we have demanded payment of said contractors and they have refused to pay us, and we therefore notify you to retain the amount so due out of the amount owing by you to the said contractors, or that may hereafter become due from you to said contractors, for labor or materials used in the erection and construction of said building, and that you pay the same to us.

"Dated November 1st, 1903.

"COLLINS, LAVERY & COMPANY,

"*Per* S. B. COLLINS,

"*President.*"

The assignment and the notice were delivered to the McNab & Harlin Manufacturing Company at the same time, on December 19th, 1903, although the assignment appears to have been executed on November 2d, 1903, which is also the date of the order.

The order and assignment were entirely inoperative as against this receiver as transfers, inasmuch as the Paterson Building Company was insolvent at the time the instruments were executed, to the knowledge of Messrs. Collins, Lavery & Company. I think, however, that all the papers, and especially the assignment and the notice, must be taken together and examined with a view to ascertaining whether they amount in the aggregate to the "notice in writing" required by the statute in order to the establishment of the debt which they mention as a lien upon the fund in the hand of the McNab & Harlin Manufacturing Company. The statute prescribes no form of notice; it merely directs that the lienor shall "give notice in writing to the owner" of certain things. If the owner in this case received notice of these things by the two papers which were delivered to it, and which plainly related to the same matter, then it seems to me the statutory requirement was met and the lien was established. The description of the contractor as a partnership instead of a corporation, in my opinion, is a mere misnomer, which could not possibly have misled the McNab & Harlin Manufacturing Company or any other party in any way interested in this transaction. To hold otherwise, it seems to me, would be to convert the notice into a technical instrument in the nature of a pleading, and to disregard the function of the notice as a means of merely giving information and putting a party upon the inquiry. The notice on its face plainly exhibits a clerical error, which probably was made by the operator on the typewriting machine who wrote out the paper for service. The debt ($540.52) is stated to have been used by the *owner* in erecting the building, but the notice goes on to state that the claimant had demanded payment of the contractor and that payment had been refused. The error could not have misled anyone and it was corrected by the distinct recitation in the assignment, by which the Paterson Building Company, misdescribed as a partnership, acknowledged that the debt ($540.52) was due "for work done and materials furnished by the said Collins, Lavery & Co.," and used by the Paterson Building Company in the erection of the building. The notice distinctly sets forth the two things expressly prescribed by the statute, viz., (1) the refusal to pay, (2) a specified sum of money.

The difficulty about this notice, which caused me some hesitation, arises from the fact that it states that the debt was due "for work done," as well as for materials furnished. In the case of Messrs. Adamson & Son their notice was sustained, although it stated that their claim was for work as well as for materials, while upon the proofs their lien was established as a lien for materials only. The notice, however, described correctly, in popular language, the nature of the debt for which the lien was claimed, although technically such description might be deemed inaccurate. In the case of Collins, Lavery & Company, I think it is plain that their debt, although due to them for materials within the contemplation of this statute, in fact must have included a charge for labor. The proofs showed that the materials were delivered by Collins, Lavery & Company, partly at the building, in Paterson, and partly, I think, on the cars. The price charged for which the lien was claimed included both the value of the material and the value of the labor which Collins, Lavery & Company expended in its transportation. It is somewhat difficult, I think, to distinguish between labor expended in the transportation of material to the building and labor expended in incorporating the material into the structure itself. In each instance it would seem that the labor is "used" in the erection of a building. The notice, therefore, in the case of Collins, Lavery & Company, while not correct according to the popular usage of language, and not technically correct under the statute, seems to have described with accuracy the debt for which a lien properly could be claimed.

We have, then, in this case a debt in fact lienable, a notice in writing describing a debt which might be lienable, as sufficient in form as that which was sustained in the *Beckhard Case,* and ample notice in fact to the owner, the McNab & Harlin Manufacturing Company, of the nature of the claimant's debt, and that the notice was intended to establish a lien for the same. No case that I know of has held that if the notice on its face be sufficient, the lien fails in case it should turn out that the notice misdescribed the debt for which the lien was claimed, although the debt in fact was lienable.

My conclusion is that my original ruling in regard to this debt of Collins, Lavery & Company is inconsistent with the principles necessarily underlying the decision of the court of errors and appeals in the *Beckhard Case,* and therefore cannot stand. The defendant will be allowed its lien.

The last claim to be considered is that of Cornelius J. Gallagher. This is a debt due a subcontractor who excavated the cellar for the building with his teams and laborers at a price per cubic yard. There is no possible claim that Mr. Gallagher is a materialman. He is plainly a subcontractor, and as such would have a lien by stop notice under the act of 1905, above cited. He certainly was not a "journeyman" employed by any-one. If his debt was lienable under the statute which governs this case, it seems plain that he must be deemed "a laborer em-ployed by the contractor."

Giving the widest possible effect to the decision of the court of errors and appeals in the case of *Beckhard* v. *Rudolph,* I am unable to find that Mr. Gallagher was a "laborer" employed by the Paterson Building Company within the meaning of section 3. For years a lien by stop notice was given to "any journeyman or laborer employed" by the contractor to secure his "wages" before any such lien was given to a materialman. When the lien was given to the materialman it was confined to those cases where the written contract with the owner was filed. Originally, as we have seen, there was no antithesis between the two sec-tions which give the "journeyman or laborer" employed by the contractor his two distinct liens. I see no reason to believe that the legislature, when it made a great step in advance and gave the lien by stop notice to materialmen, changed the meaning of the words "journeyman and laborer," which had been employed for years to describe persons who earned "wages." It is the personal "wages" which are earned by a man in the direct em-ploy of the contractor which manifestly the statute intended originally to secure.

That the word "laborer" in section 3 does not include a sub-contractor who is an employer of labor is very strongly indicated by section 6 of our present act, which embodies an amendment of the statute passed in 1895. This section provides that "in all

cases journeymen or laborers shall have priority or preference over any *employers of labor,* contractors or materialmen,' for the payment of *wages,* without reference to the date when said journeymen or laborers shall have filed the lien or served the notice provided for in this act." Mr. Gallagher is plainly an employer of labor, and belongs to a class which the statute sharply distinguishes from journeymen or laborers employed by a contractor who earn wages.

I see no way by which this court can, by any construction of this statute, give Mr. Gallagher the lien which the legislature has now established, or attempted to establish, for all cases similar to his in the future, and which no doubt it would have long ago undertaken to give to the class of business men to whom Mr. Gallagher belongs if attention had been earlier called to their case.

What is the exact status of subcontractors under this new and apparently hasty legislation may be a somewhat difficult matter to determine, and any discussion of the subject at present would be entirely out of place. It may be noted, however, that the subcontractor is placed in the same class with the journeyman or laborer employed by the contractor, and not in the same class with the materialman, which fact indicates that at the present time no lien by stop notice can be acquired by anyone if the owner's contract has not been filed. The case of the subcontractor is further complicated by the omission to make changes in the subsequent sections of the act, especially section 4, corresponding with the changes made in section 3.

In case any of the claimants desire to have the determination of this court reviewed by the court of errors and appeals, the fund will be held until such review can be obtained. I am by no means certain that the adjudications which I have made upon these notices will in the end stand as approved precedents. Questions of statutory construction are notoriously difficult and productive of discordant decisions and decisions by divided courts. When a statute like the one with which we are dealing is not in its entirety based upon any ethical principle, but arbitrarily confers a favor through a somewhat complex procedure upon a somewhat loosely-defined class of beneficiaries, and is ex-

pressed in clumsy and inapt phraseology, it is unsafe to accept any construction of it as final which has not been approved by the court of last resort or by a majority of the judges of such court.