## DOUGLASS *v.* COUNTY OF PIKE.

1. The court reviews the legislation and judicial decisions of Missouri, whereby the constitutionality of an act of the General Assembly, entitled "An Act to facilitate the construction of railroads in the State of Missouri," approved March 23, 1868, was recognized and affirmed long after the county authorities had issued, pursuant to its provisions, the bonds whereon this suit was brought. The court in this case adheres to its ruling in accordance with those decisions, as announced in *County of Cass* v. *Johnston* (95 U. S. 360), although the Supreme Court of Missouri has since declared that act to be in conflict with sect. 14, art. 11, of the Constitution, adopted by that State in 1865.
2. Where municipal bonds have been put upon the market as commercial paper, the rights of the parties thereto are to be determined according to the statutes of the State as they were then construed by her highest court; and in a case involving those rights this court will not be governed by any subsequent decision in conflict with that under which they accrued.
3. The settled judicial construction of a statute, so far as contract rights were thereunder acquired, is as much a part of the statute as the text itself, and a change of decision is the same in its effect on pre-existing contracts as a repeal or an amendment by legislative enactment.

ERROR to the Circuit Court of the United States for the Eastern District of Missouri.

This was an action by Joseph M. Douglass on three hundred and twenty-one overdue coupons detached from bonds issued by the county of Pike, Missouri. The bonds are in the following form: —

" No. ——.]          STATE OF MISSOURI.          [$500.00.

PIKE COUNTY BOND.

" *Issued in payment of Stock of the Pike County Short Line Railroad Company.*

" Know all men by these presents, that the county of Pike, in the State of Missouri, acknowledges itself indebted and firmly bound to the Pike County Short Line Railroad Company in the sum of five hundred dollars, which sum the said county promises to pay to the said Pike County Short Line Railroad Company, or bearer, at the National Bank of the State of Missouri, in St. Louis, Mo., on the first day of January, A.D. 1892, with interest thereon from the first day of January, A.D. 1872, at the rate of ten per cent per annum; which interest shall be payable semi-annually on the presentation and delivery at said National Bank, of the coupons of interest hereto attached; this bond being issued under and pursuant to an order of the county court of Pike County, by authority of an act of the General Assembly of the State of Missouri, approved March 23, 1868, entitled ' An Act to facilitate the construction of railroads in the State of Missouri,' and authorized by vote of the people of Cuivre Township, in said county, taken as required by law, Feb. 7, 1871.

" In testimony whereof, the said county of Pike has executed this bond, by the presiding justice of the county court of said county, under the order thereof, signing his name hereto, and by the clerk of said court, under the order thereof, attesting the same and affixing the seal of said court; this done at Bowling Green, county of Pike aforesaid, this first day of January, A.D. 1872.

" [SEAL.]                              A. G. GRIFFITH,
          " *Presiding Justice of County Court of Pike County, Missouri.*
                    " Attest :          H. C. CAMPBELL,
                    "*Clerk of County Court of Pike County, Missouri.*

The declaration avers that the county, in behalf of said township, subscribed for and received and retains the stock of said railroad company to an amount equal to the bonds, and paid the coupons falling due up to Jan. 1, 1876; that the road was built through the township; that the subscription was authorized by a vote duly taken, as required by law, on the seventh day of February, 1871; that he is the holder for value of the coupons sued on, and that he duly presented them for

payment at said bank as they became due, and that payment was refused.

Judgment was rendered in favor of the defendant on its demurrer to the plaintiff's declaration, the question involved being the constitutionality of the act whereof mention is made in the bonds.

The plaintiff thereupon sued out this writ of error.

*Mr. John H. Overall* and *Mr. Frederick N. Judson* for the plaintiff in error.

*Mr. George F. Edmunds* and *Mr. Thomas J. C. Fagg* for the defendant in error.

MR. CHIEF JUSTICE WAITE delivered the opinion of the court.

We are asked to reconsider our decision in *County of Cass* v. *Johnston* (95 U. S. 360), because since that case the Supreme Court of Missouri, in *State, ex rel. Woodson,* v. *Brassfield* (67 Mo. 331), and *Webb* v. *La Fayette County* (id. 353), has held the Township Aid Act, which we sustained, to be unconstitutional. The question presented, as we view it, is not so much whether these late decisions are right, as whether they should be followed in cases having reference to bonds put out and in the hands of innocent purchasers when they were announced. In the Cass County case we said that the Supreme Court of the State had often been called on to construe and give effect to the act, and had never before that time in a single instance expressed even a doubt as to its validity. We have again examined all the cases, and find that what we then said was true. Judge Dillon, who filled the office of circuit judge in the eighth circuit with such distinguished ability during nearly all the time the act was in operation, from its original passage until after the recent decisions, remarked in *Westerman* v. *Cape Girardeau County,* 7 Cent. Law Jour. 354: "A hundred cases — and I do not think I exaggerate — have been brought on these township bonds in the Federal courts of this State, and prior to the decision in *Harshman* v. *Bates Co.* (92 U. S. 569), none of the able lawyers defending these cases ever made a point that the act of March 23, 1868, was unconstitutional." The reason is obvious. At the very outset it

was thought best to take the opinion of the Supreme Court of the State on that subject. The act went into operation in 1868, and in 1869 *The State* v. *Linn County* (44 Mo. 504) was decided. There a township had voted to subscribe to the stock of a railroad company, and the county court had made the subscription; but after this was done the court refused " to deliver the bonds, for the alleged reason, only, that the act under which the subscription was made was unconstitutional and void." An application was then made for a *mandamus* to compel the delivery of the bonds; and the only questions presented by the counsel for the respondent in the argument of the case, as shown by the report, were those of constitutionality, and especially was it urged that the act was repugnant to art. 11, sect. 14, which, quoting from the opinion, " declares the General Assembly shall not authorize any county, city, or town to become a stockholder in, or loan its credit to, any company, association, or corporation, unless two-thirds of the qualified voters of such county, city, or town, at a regular or special election to be held therein, shall assent thereto." All the objections presented were considered by the court, and in conclusion it was said, " The county court having made the subscription, the company is entitled to the bonds." It is quite true that the precise objection which has since been raised was not then urged or considered; but the alleged discrepancy between the act and the Constitution was just as apparent then as it is now, and Judge Dillon, in *Foote* v. *Johnson County* (6 Cent. Law Jour. 346), says: " Suits in great numbers on these township bonds have been brought in the Circuit Court of the United States for this district, and they have been defended by the ablest lawyers in the State, upon every ground that they conceived open to them; but this difference between the phraseology of the Constitution and the act, so patent that it could not escape attention, was never presented or urged in any case, so far as either of us recollect, as invalidating the act." In *County of Cass* v. *Johnston*, we attributed this to the fact that in other cases it had been substantially decided that the language of the act and that of the Constitution were in legal effect the same, and we at that time took occasion to look somewhat critically into the rulings on that subject. We have again examined that

question, and are satisfied with the correctness of our former conclusion.    It is thought, however, that we did not give sufficient effect to *State* v. *Sutterfield*, 54 Mo. 391.    As to that, we said the question presented related to another clause of the Constitution, and that the decision was placed expressly on the ground of a difference between the two provisions.    In this it is urged we were in error.    The clause of the Constitution there under consideration was art. 4, sect. 30, which is : " The General Assembly shall have no power to remove the county seat of any county, unless two-thirds of the qualified voters of the county, at a general election, shall vote in favor of such removal." Under this provision of the Constitution a statute was passed providing for elections in such cases, to the effect, " if it shall appear by such election that two-thirds of the legally registered voters of said county are in favor of the removal of the county seat of such county, then," &c.    In the opinion the court say : " There is no doubt that in general, when an election is held to determine the choice of a candidate, or the determination of some question of public policy, the plurality required by law, whether it be a bare majority, or two-thirds or three-fourths, is determined by the result of the vote cast, without regard to the number declining to vote ; and this is upon the ground that a failure to vote is assumed, or may be presumed, to be an acquiescence in whatever result may be produced by the action of those who feel a sufficient interest in the election to go to the polls and vote, and for the further reason that in most cases there is no mode by which the number of absentees can be ascertained. . . . Our Constitution in regard to the proposed removal of county seats, it seems to me, hardly admits of two constructions.    It prohibits the legislature from removing them unless two-thirds of the qualified voters shall, at a general election, vote for the removal.    The words do not imply an acquiescence or negative sanction, or a negative assent inferred from absence, but a positive vote in the affirmative, and the number of votes required is specifically named, and there is no difficulty in ascertaining what that number is, since the same Constitution provides for a registration, and points out who qualified voters are ; and the statute in this case uses the words ' legally registered voters,' and requires two-thirds of them to

vote for the change." The court then refers to *Bassett* v. *The Mayor of St. Joseph* (37 Mo. 270), *State* v. *Binder* (38 id. 450), and *State* v. *Winkelmeier* (35 id. 103), and says: " In none of these cases, however, was there any examination of, or construction given to, the precise language of the constitutional provision now under consideration. . . . The present case, however, presents very different considerations. The question of removing county seats was regarded by the framers of the Constitution as of sufficient importance to require very stringent provisions in that instrument, and an examination of the laws in force on this subject, at the time of the adoption of the new Constitution, will show the great importance of requiring a strict compliance with its provisions." We think, then, we were not in error in supposing that the court believed there was an essential difference between the two provisions of the Constitution, and especially so as the judge who delivered the opinion of the court in *State* v. *Sutterfield*, by his dissent in the later cases of *State* v. *Brassfield* and *Webb* v. *La Fayette County*, clearly indicates his disapproval of the effect upon the question now under consideration which was then given that case.

The legislative recognition of the difference between these two clauses of the Constitution is equally apparent. The Constitution went into effect in July, 1865, and it became the duty of the legislature, at its next session, which commenced in November, to adapt the old laws to the new order of things. In this connection, it must be borne in mind that the provision for a registration of voters was first introduced into the policy of the State by this new Constitution.

The then existing law regulating the removal of county seats provided that " whenever three-fifths of the taxable inhabitants of any county, as ascertained by the tax-list made and returned last preceding the application, shall petition the county court praying a removal of the seat of justice thereof to a designated place, the court shall appoint five commissioners," &c. Rev. Stat. Mo. 1855, p. 514, sect. 1. To meet the requirements of the new Constitution on this subject, an election was provided for, and it was enacted that if it should appear by such election that two-thirds of " the legally registered voters " were in favor

of. the removal, commissioners should be appointed to perform the same duties prescribed in the old law. Gen. Stat. Mo. 1865, p. 223, sects. 20–22. Here it is evident the legislature had in mind both the provision for registration of voters and the somewhat unusual requirement that two-thirds of the qualified voters of the county should *vote* for the measure.

The old law respecting the subscription by the county courts to the capital stock of railroad corporations was as follows.: " It shall not be lawful for the county court of any. county to subscribe to the capital stock of any railroad company, unless the same has been voted for by a majority of the resident voters who shall vote at such election under the provisions of this act." Acts of 1860–61, p. 60, sect. 2. In adapting this to the new constitutional requirements, this is the language used : " It shall be lawful for the county court of any county, the city council of any city, or the trustees of any incorporated town, to take stock, &c., provided that two-thirds of the qualified voters of such county, city, or town, at a regular or special election to be held therein, shall assent to such subscription." Gen. Stat. Mo. 1865, p. 338, sect. 17. This, it will be seen, is the exact language of the Constitution itself, and the intention evidently was to leave its meaning to be ascertained by judicial construction. By another statute passed at the same session of the legislature, the charter of the city of St. Joseph, which had before authorized subscriptions to the capital stock of railroad companies if a majority of the real estate owners in the city sanctioned the same, was amended so as to require that question to be submitted " to a vote of the qualified voters of said city, and in all such cases it shall require two-thirds of such qualified voters to sanction the same." Acts of 1865–66, p. 269, sect. 1. At the same session, in amending the charter of the town of Clarksville, evidently to accomplish the same object, this is the language employed : " After first having obtained the consent of the inhabitants, as required by the Constitution of the State." Id. p. 254, sect. 1.

At the February Term, 1866, of the Supreme Court of the State, that court was called on, in *Bassett* v. *The Mayor of St. Joseph* (37 Mo. 270), to give a construction to the act amend-

ing the charter of St. Joseph. Under that act an election was held on the 13th of January, 1866, to vote upon the question of an issue of bonds, and four hundred and four votes were polled, of which three hundred and thirty-six were in favor of and fifty-eight against the measure. The mayor refused to sign the bonds after the vote had been taken, and a *mandamus* was asked to require him to do so. The only reason he gave for declining to sign the bonds was, that " he was in doubt whether the matter was to be determined by two-thirds of the votes polled at the special election, or by two-thirds of all the voters resident in the city, absolutely, whether voting or not." In the argument in support of the application for the writ, the attention of the court was called to the fact that there was "no registry law by which the qualified voters in the city could be ascertained," and it was further said, " the votes cast at the last election for city officers and the votes cast at said subsequent election furnish the only correct criterion to ascertain the number of qualified voters in the city at the time said special election was held." In the opinion, mention is also made of the number of votes polled at the next preceding election; but the court, after stating the exact question put by the mayor as indicating his own doubts, uses this direct and unmistakable language : " We think it was sufficient that two-thirds of the qualified voters who voted at the special election authorized for the express purpose of determining that question, on public notice duly given, voted in favor of the proposition. This was the mode provided by law for ascertaining the sense of the qualified voters on that question. There would appear to be no other practicable way in which this matter could be determined." It is true, the bonds voted at this election were not to be used in payment of subscriptions to the stock of railroad companies, but the law construed was the one in which provision was made for such subscriptions. Following this, at the October. Term, 1866, of the same court, was the case of *State* v. *Binder* (38 Mo. 450), in which similar language in another statute was construed, and *Bassett* v. *The Mayor of St. Joseph* cited as establishing the doctrine " that an election of this kind authorized for the very purpose of determining that question, on public notice duly given, was the mode contemplated by the

legislature as well as by the law for ascertaining the sense of the legal voters upon the question submitted, and that there could not well be any other practicable way in which such a matter could be determined. And," continues the court, "certainly, in the absence of any evidence to the contrary, it may be presumed that the voters voting at an election so held were all the legal voters of the city; or, that all those who did not see fit to vote (if there were any) acquiesced in the action of those who did vote, and so are to be considered as equally bound and concluded by the result of the election. *Rex* v. *Foxcroft*, 2 Burr. 1017; Wilcox on Corp. 546." Certainly, after these two decisions, made under the circumstances that attended them, and with the mind of the court directed by counsel in their argument to the registration laws, it might fairly be assumed by the legislature to have been judicially determined that the assent of two-thirds of the qualified voters voting at an election duly called and notified, was the legal equivalent of the assent of two-thirds of the qualified voters of an election precinct. Hence it was that at the session of the legislature which began in January, 1868, and as soon, probably, as the effect of these decisions had become generally understood, to avoid all future doubts as to what was meant, the equivalent language, as construed by the courts, was used, instead of that of the Constitution itself. And so we find not only in the Township Aid Act, but in other acts depending for their authority on the same clause of the Constitution, the requisite assent of those voting at an election was deemed by the legislature to be the assent of the qualified voters.

It was under this state of facts and the law that *The State* v. *Linn County* (*supra*) was heard and decided. Other objections to its constitutional validity than those which had formerly been considered were raised, argued, and decided in favor of the law. · From that time forward, and until long after the issue of the bonds now in question, the law was treated by the courts and the people as valid and constitutional. No lawyer asked for a professional opinion on that subject could have hesitated to say that it had been settled. It would seem as though every question which could be raised had in some form, directly or indirectly, been presented and decided. While some of the

decisions were rendered before the passage of the township act, it is so clear that the peculiar language of that act was the consequence of those decisions that we do not deem it unreasonable to give them all the effect they would have if made afterwards.

We are, then, to consider whether, under these circumstances, we must follow the later decisions to the extent of destroying rights which have become vested under those given before. As a rule, we treat the construction which the highest court of a State has given a statute of the State as part of the statute, and govern ourselves accordingly ; but where different constructions have been given to the same statute at different times, we have never felt ourselves bound to follow the latest decisions, if thereby contract rights which have accrued under earlier rulings will be injuriously affected. The language of Mr. Chief Justice Taney, in *Rowan* v. *Runnels* (5 How. 134), expresses the true rule on this subject. He said, p. 139: " Undoubtedly this court will always feel itself bound to respect the decisions of the State courts, and, from the time they are made, regard them as conclusive in all cases upon the construction of their own laws. But we ought not to give them a retroactive effect, and allow them to render invalid contracts entered into with citizens of other States which, in the judgment of this court, were lawfully made." Afterwards, in *Ohio Life Insurance and Trust Co.* v. *Debolt* (16 How. 416), the same learned Chief Justice, after reiterating what he had before said in *Rowan* v. *Runnels*, uses this language : " It is true the language of the court in that case is confined to contracts with citizens of other States, because it was a case of that description which was then before it. But the principle applies with equal force to all contracts which come within its jurisdiction." This distinction has many times been recognized and acted upon. *Supervisors* v. *United States*, 18 Wall. 71; *Fairfield* v. *County of Gallatin*, 100 U. S. 47. Indeed, if a contrary rule was adopted, and the comity due to State decisions pushed to the extent contended for, " it is evident," to use again the language of Mr. Chief Justice Taney, in *Rowan* v. *Runnels*, " that the provision of the Constitution of the United States, which secures to the citizens of another State the right to sue in the courts of

the United States, might become utterly useless and nugatory."
The true rule is to give a change of judicial construction in respect to a statute the same effect in its operation on contracts and existing contract rights that would be given to a legislative amendment; that is to say, make it prospective, but not retroactive. After a statute has been settled by judicial construction, the construction becomes, so far as contract rights acquired under it are concerned, as much a part of the statute as the text itself, and a change of decision is to all intents and purposes the same in its effect on contracts as an amendment of the law by means of a legislative enactment.

So far as this case is concerned, we have no hesitation in saying that the rights of the parties are to be determined according to the law as it was judicially construed to be when the bonds in question were put on the market as commercial paper. We recognize fully, not only the right of a State court, but its duty to change its decisions whenever, in its judgment, the necessity arises. It may do this for new reasons, or because of a change of opinion in respect to old ones; and ordinarily we will follow them, except so far as they affect rights vested before the change was made. The rules which properly govern courts, in respect to their past adjudications, are well expressed in *Boyd* v. *Alabama* (94 U. S. 645), where we spoke through Mr. Justice Field. If the Township Aid Act had not been repealed by the new Constitution of 1875 (art. 9, sect. 6), which took away from all municipalities the power of subscribing to the stock of railroads, the new decisions would be binding in respect to all issues of bonds after they were made; but we cannot give them a retroactive effect without impairing the obligation of contracts long before entered into. This we feel ourselves prohibited by the Constitution of the United States from doing. We always regret to find ourselves in conflict with the courts of the States in matters affecting local law, but when necessary we cannot refrain from acting on our own judgment without abrogating our constitutional jurisdiction.

For these reasons, the judgment of the Circuit Court will be reversed, and the cause remanded with directions to overrule the demurrer to the petition, and take such further proceedings,.

not inconsistent with this opinion, as law and justice may require; and it is

*So ordered.*

NOTE. — In *Darlington* v. *County of Jackson*, error to the Circuit Court of the United States for the Western District of Missouri, which was argued by *Mr. John B. Henderson* for the plaintiff in error, and by *Mr. John C. Gage* for the defendant in error, and in *Foote* v. *County of Pike*, error to the Circuit Court of the United States for the Eastern District of Missouri, which was argued by *Mr. John B. Henderson* and *Mr. Odon Guitar* for the plaintiff in error, and by *Mr. George F. Edmunds, Mr. Thomas J. C. Fagg,* and *Mr. Fillmore Beall* for the defendant in error, MR. CHIEF JUSTICE WAITE delivered the opinion of the court, reversing the judgments below on the authority of *Douglass* v. *County of Pike, supra,* p. 677.