THE GEORGE A. MILLS, &C.; COMPANY, appellant,

*v.*

HEGEMAN-HARRIS COMPANY, respondent.

[Decided May 10th, 1923.]

On appeal from a decree of the court of chancery advised by Vice-Chancellor Griffin, who filed the following opinion:

"The Morris County Golf Club entered into a contract with Hegeman-Harris Company [hereinafter called the contractor] by the term of which payments were to be made upon the certificate of the architect. The contractor made a subcontract with J. C. Raab & Company [hereinaftef called Raab] for the carpenter work. Raab abandoned the work on or about July 10th, 1920, and the same was completed by the contractor at a loss to itself of upwards of $3,000. The following persons served stop-notices on the owner for work done and materials furnished to Raab:

"On August 14th, 1920, Ruthven filed his stop-notice for $1,552.74.

"On August 3d, 1920, Mills & Company filed their stop-notice for $4,497.51.

"On October 23d. 1920, Green & Pierson filed their stop-notice for $1,923.30.

"On October 1st, 1920, Mills & Company served another stop-notice, which was for work done and materials furnished to Hegeman-Harris. Company after Raab abandoned the woik, and I understand from the stipulation that this sum either has been or may be paid, and it is so consented to by the parties.

"In this situation the golf club filed its bill of interpleader, and the various claimants filed concise statements

of their several claims, to which the Hegeman-Harris Company filed its objections.

"On April 18th, 1921, Raab & Company and Raab were declared bankrupts; and on August 29th, 1921, Stuhr, the trustee, filed a disclaimer.

"On August 29th, 1921, an order was made to pay to the contractor $12,047.84.

"On August 30th, 1921, an interlocutory decree was entered directing the parties to interplead.

"Thus, the complainant goes free, permitting the various defendants to litigate as to the fund.

"I may say that, in pursuance of the terms of the contract between the golf club and the contractor, payments were to be made upon the application of the contractor, and the certificate of the architect. These certificates were given. The contract between Raab and the contractor also provides for payment on the production of the architect's certificate, which certificates were not actually procured. I find, also, on investigating the figures, that the items paid to Raab, excepting certain overpayments, were included in the contractor's application for payment, and were included in the certificates given to the contractor; and if it was an important factor in the case, I would find that these certificates, so furnished by the architect to the contractor to be delivered to the owner, which were predicated upon the claims and applications of Raab, were the certificates of the architect under the contract between the contractor and Raab; but, for reasons hereinafter given, it is unnecessary to pass upon this question.

"As the fund is insufficient to pay the contractor, it is entitled to the whole fund, unless, by reason of the Mechanics' Lien act, the claims of the claimants, under their stop-notices, takes precedence of the claim of the contractor. When I speak of the 'claims' here, I regard the claim of Mills & Company for thirteen hundred and odd dollars as eliminated, as this was a debt of Hegeman-Harris Company, and it was stipulated, as above stated, that it should be paid.

"The only point that can be asserted in favor of these claimants is that, in certain instances, the contractor paid in advance of the terms of its contract to Raab. An analysis of the statements showing the progress of the work, which I have compared with the applications of Raab for payments in connection with the architect's certificates, shows that, in such instances, payments were made according to the contract, deducting the retained percentage, with the exception of two small items amounting to less than $400, down to February 3d, 1920, when there was a payment in excess of the amount due under the terms of the contract of $6,686.82; and, again, on March 4th, 1920, one of $1,001.56 was made in excess. But prior thereto there had been deducted three items amounting to $5,400; thus, deducting the items of underpayment from those of overpayment, there was about $2,200 or $2,300 overpaid. And in May, 1920, there was another item of underpayment of $191.36, which further reduced the excess paid. And in June, 1920, there was a further overpayment of $1,094.22. As I recall it, all of these items, excepting the excess amounts, were contained in the certificate which the architect gave to the contractor and which it gave to the complainant. All these items of excess amount to $9,023.20. But just prior to the abandonment of the contract, in June, 1920, Raab applied for $8,698. The amount he was entitled to receive was $7,393 of this sum, but $1,000 was paid on account, and the work apparently was abandoned before the architect's certificate approving of the application came in. Thus, $6,393.30 was earned, apparently, but not paid, which inured to the benefit of the contractor and these claimants, provided the contractor had a surplus after completing the work.

"The account at the time of the abandonment stood as follows:

| | |
|---|---:|
| Overpayments ................................... | $9,023.20 |
| Underpayments (excluding the item of $6,393.30 earned at the time of abandonment but not covered by architect's certificate) ................................... | 5,611.47 |
| Overpayment ................................. | $3,412.73 |
| On August 3d, 1920, when the certificate of the architect was given on application No. 11, dated August 1st, 1920, Exhibit W. A. 10, which included Application 10, which showed that Raab had earned $8,698, upon which he was entitled to receive $7,393.30, he was paid $1,000—thus he was underpaid $6,393.30, which, with other underpayments, made the amount (see statement showing progress of work) ........................... | 12,004.77 |
| Deduct the overpayment above ....................... | 9,023.20 |
| Shows that Raab was underpaid ................ | $2,981.57 |

"Thus, on August 3d, 1920, when the architect gave a certificate which embraced Application 10, which included the $6,393.30, the right of creditors under stop-notices served thereafter was gone. *Slingerland* v. *Binns, 56 N. J. Eq. 413; Person* v. *Herring, 63 N. J. Law 599; Smith* v. *Dodge, Bliss & Co., 59 N. J. Eq. 584.* This rule would exclude all whose notices were served after August 3d, 1920, and, possibly, the one served on that day—where the work had been abandoned by the debtor and the certificate was delivered at the time of or prior to the service of the stop-notice.

"I am stating these facts for the benefit of counsel, not with the idea of deciding that, if there was an overpayment at the time the contract was abandoned and not covered by the subsequent certificate of August 3d, 1920, it would inure to the benefit of the claimants. This I do not deem it necessary to pass upon, for the following reason: Prior to the act of 1895 (*P. L. p. 313*), when the fifth section as it now exists was passed, the contractor was free to deal with the fund as he saw fit, he might assign or dispose of it effectually prior to the service of stop-notices on the owner. To avoid this injustice the fifth section was passed, which may be found in *Comp. Stat. p. 3298 § 5.* In reading this section, it must be borne in mind that it refers only to the liability of the owner for advance payments, and not to the con-

tractor. It says, in substance, that if the owner, for the purpose of avoiding the provisions of this act, or, in advance of the terms of such contract, pay any money, &c., under the contract, and the amount still due the contractor after such payments shall be insufficient to satisfy the notices served, such owner shall be liable in the same manner as if no such payment had been made. I find nowhere in the statute anything [nor has it been pointed out to me by counsel] indicating that, if the contractor makes a payment to his subcontractor in advance of the terms of the contract, he shall be liable in the same manner as if no such payment had been made.

"Section 3 of the *Comp. Stat. p. 3294,* refers to materialmen and employes of the principal contractor; and it has been held that an employe of a subcontractor had no right to serve a notice under section 3. To overcome this, section 3 was amended (*P L. 1917 p. 821*), giving to an employe, materialman or subcontractor, of the subcontractor, the power to serve notice (*Steuerwald* v. *Munn, 90 N. J. Eq. 374*), and I presume that it is under this act that the notices have been served in this case.

"While this section 3, as amended, gives claimants the right to serve their notices, yet, in order to prevail, they must go a step further, *i. e.,* they must show some statute which makes the contractor liable for making advance payments. This they cannot do because there is no such statute.

"The fund in court being insufficient to satisfy the amount due to the contractor, a decree will be advised that the whole fund be paid to it."

*Messrs. Vreeland & Wilson,* for the appellant.

*Mr. William E. Decker,* for the respondent.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion filed in the court below by Vice-Chancellor Griffin.

*For affirmance*—THE CHIEF-JUSTICE, SWAYZE, TREN-CHARD, PARKER, BERGEN, KALISCH, MINTURN, BLACK, KAT-ZENBACH, WHITE, HEPPENHEIMER, GARDNER, VAN BUS-KIRK—14

*For reversal*—None.