ARROW BUILDERS SUPPLY CORP., A NEW YORK COR-
PORATION, PLAINTIFF-APPELLANT, v. HUDSON TER-
RACE APARTMENTS, INC., A NEW JERSEY CORPORA-
TION, DEFENDANT-RESPONDENT.

BERGEN BUILDING BLOCK, INC., A NEW JERSEY CORPO-
RATION, PLAINTIFF-APPELLANT, v. HUDSON TER-
RACE APARTMENTS, INC., A NEW JERSEY CORPORA-
TION, DEFENDANT-RESPONDENT.

Argued March 29, 1954—Decided May 17, 1954.

*Mr. Harry Phillipson* argued the cause for the appellants (*Mr. Frank G. Alster,* attorney for appellant Arrow Builders Supply Corp.; *Mr. Harry Phillipson,* attorney for appellant Bergen Building Block, Inc.).

*Mr. Aaron Heller* argued the cause for the respondent (*Messrs. Heller & Laiks,* attorneys).

The opinion of the court was delivered by

JACOBS, J. The defendant Hudson Terrace Apartments, Inc. owned land located in Fort Lee, New Jersey. As owner, it entered into a written contract with the contractor, Glenwood Builders, Inc., for the construction of apartment buildings. Before the commencement of work or the delivery of materials the contract was duly filed pursuant to *R. S.* 2:60–115 (now *N. J. S. 2A* :44–75). The contractor entered into an agreement with the subcontractor ARA Construction Corporation for the masonry work required in the buildings and the subcontractor purchased building materials from the plaintiffs. The materials were delivered by the plaintiffs to the building site and they were actually used in the erection and completion of the buildings. The subcontractor failed and refused to pay the plaintiffs the balance due for the materials and they filed stop notices with the county clerk in accordance with *N. J. S. 2A* :44–77. Copies of the stop notices were served upon the owner in accordance with *N. J. S. 2A* :44–78, 79. The claims of the materialmen be-

ing disputed, they instituted action against the subcontractor and obtained judgments against him. See *N. J. S. 2A* :44–83. When the plaintiffs filed their stop notices there was no money due from the contractor to the subcontractor; the latter had defaulted in the performance of its contract thereby requiring the contractor to complete the masonry work. However, when the stop notices were filed there was due or about to become due sufficient sums from the owner to the contractor to pay the full claims of the plaintiffs.

The plaintiffs instituted separate actions in the Superior Court, Law Division, claiming that under the terms of the Mechanics' Lien Law the defendant owner was obligated to pay their claims from the unpaid sums due from him to the contractor. The defendant denied liability, contending that the stop notices filed and served by the plaintiffs did not establish any "right of recourse or lien against the funds in the hands of the Owner due to the Contractor." The actions were consolidated and the parties submitted the agreed facts as aforestated to the trial court for legal determination. Judge Leap, sitting in the Superior Court by temporary assignment, found in the defendant's favor although his opinion suggested that the pertinent statutory provisions required a contrary result which he would have reached were it not for the decision of the Court of Errors and Appeals in *Mills & Co. v. Hegeman-Harris Co.*, 94 *N. J. Eq.* 802, 806 (*E. & A.* 1923). But see *St. Michael's, etc., Hopewell v. Conneen Constr. Co.*, 114 *N. J. Eq.* 276 (*Ch.* 1933), affirmed 115 *N. J. Eq.* 334 (*E. & A.* 1934). The plaintiffs appealed to the Appellate Division and we certified on our own motion.

Our first statutory enactment relating to mechanics' liens was adopted early in the 19th Century (*L.* 1820, *p.* 124) ; since then there have been many enactments designed to afford liens to persons who contribute labor or materials used in the construction of buildings. See *Luce, Mechanics' Lien Law of New Jersey* (3d ed. 1923), 6 ; *Lodge, Mechanics' Liens in New Jersey* (1940), 5. From time to time our courts have expressed misgivings as to the policies underly-

ing the preferential treatment thus afforded by the Legislature. *Ayres v. Revere*, 25 *N. J. L.* 474, 481 (*Sup. Ct.* 1856); *McNab & Harlin Mfg. Co. v. Paterson Building Co.*, 71 *N. J. Eq.* 133, 139 (*Ch.* 1906), affirmed 72 *N. J. Eq.* 929 (*E. & A.* 1907). And with these misgivings they have sometimes applied rather strict rules of statutory interpretation. See *Dalrymple v. Ramsey*, 45 *N. J. Eq.* 494, 496 (*Ch.* 1889); *Associates of Jersey Co. v. Davison*, 29 *N. J. L.* 415, 423 (*E. & A.* 1860). But see *Rizzolo v. Poysher*, 89 *N. J. L.* 618, 622 (*E. & A.* 1916). However, as we view our proper judicial function, it is not to pass judgment on the wisdom or policy of the legislation or to apply strict rules of interpretation which defeat legislative wishes; the constitutionality of the legislation not being disputed here (*cf. Gardner & Meeks Co. v. N. Y. Central & H. R. R. Co.*, 72 *N. J. L.* 257 (*E. & A.* 1905)), our only function is fairly to seek and effectuate the legislative purpose now expressed in *N. J. S.* 2A:44–77–80. See *Gardner & Meeks Co. v. Herold*, 76 *N. J. L.* 524, 529 (*E. & A.* 1909). *Cf. Board of National Missions v. Neeld*, 9 *N. J.* 349, 353 (1952); *De Lorenzo v. City of Hackensack*, 9 *N. J.* 379, 387 (1952); *Grobart v. Grobart*, 5 *N. J.* 161, 166 (1950).

In 1835 the Legislature adopted "An Act Securing to Mechanics, and others, payment for their labor and materials in erecting any house, or other building, within the limits therein mentioned." *L.* 1835, *p.* 148. Section 3 thereof provided the remedy by stop notice but it was available only to wage claimants (journeymen and laborers) and applied to funds due their employer from the owner of the building. Later enactments extended the terms of section 3 to persons who furnished materials used in the erection of the building but were refused payment by the contractor engaged by the owner. *L.* 1853, *p.* 438; *L.* 1863, *p.* 275. In 1895 section 3 was amended to provide that when stop notices were duly served by journeymen, laborers or materialmen the owner shall pay their claims upon the contractor's continued refusal of payment, from funds then or thereafter due from the owner to the contractor. *L.* 1895, *p.* 313; *L.* 1898, *p.*

538. In 1905 section 3 was amended to extend to subcontractors; it provided that whenever any contractor refused to pay any person who furnished materials to him "or any sub-contractor, journeyman or laborer employed by him in erecting or constructing any building" then the stop notice remedy against the owner was available as therein prescribed. *L.* 1905, *p.* 311. See also *L.* 1910, *p.* 500. *Cf.* Stevenson, V. C. in *McNab & Harlin Mfg. Co. v. Palerson Building Co., supra,* 71 *N. J. Eq.* at *page* 144: "That the Legislature of this state had continuously for years favored the lien of the materialman by stop notice is quite apparent."

In *Carlisle v. Knapp,* 51 *N. J. L.* 329 (*E. & A.* 1889), the Court had occasion to consider whether, under the legislation then in force, persons who furnished materials to subcontractors could seek recourse under section 3 against funds due or to become due from the owner to the contractor. The Court held that they could not upon the view that section 3 should be construed as affording protection only to creditors of the contractor and as not extending to creditors of subcontractors engaged by the contractor. However, in 1917 section 3 was again amended to enlarge its protective scope and this time it embodied language which was directly designed to protect materialmen and laborers who were employed by and were creditors of contractors other than the general contractor. Thus it set forth that whenever any master workman or contractor, or any "contractor under any master workman or contractor," shall refuse to pay materialmen or laborers employed by him in constructing any building, then the stop notice remedy against the owner as therein provided shall be available. *L.* 1917, *p.* 821. In *Steuerwald v. Munn,* 90 *N. J. Eq.* 474 (*Ch.* 1919), Vice-Chancellor Foster, in discussing the 1917 amendment, pointed out that it extended the provisions of section 3 "to debts owing to materialmen and others by subcontractors" and provided for the service of stop notices upon the owner and the payment by the owner of such debts owing by subcontractors "on the same conditions as the owner had, prior to such amendment, been authorized to pay similar debts of the general contractor."

In *Mills & Co. v. Hegeman-Harris Co., supra,* materialmen employed by a subcontractor served their stop notices upon the owner in strict accordance with the 1917 amendment. Previous thereto the subcontractor, who had received certain advance payments from the contractor, abandoned his work and it was later completed by the contractor at a loss. Vice-Chancellor Griffin held that the materialmen could not recover from sums due from the owner to the contractor. Although he recognized that the 1917 amendment was expressly adopted to enable materialmen and others employed by subcontractors to serve stop notices upon the owner under section 3, he nevertheless found that such claimants " 'must go a step further, *i. e.,* they must show some statute which makes the contractor liable for making advance payments. This they cannot do, because there is no such statute.' " His holding was affirmed by the Court of Errors and Appeals on the opinion below. It seems to us that this result ignored the portion of the 1917 amendment which, after first providing for the service of stop notices by materialmen employed by subcontractors, authorized the owner to retain funds due or to become due under the building contract and directed that, if the claims were not paid by the contractor or subcontractor, the owner shall pay the claims therefrom and be entitled to an allowance in the settlement of his accounts with the contractor. In the amendment, the Legislature did not concern itself with any lien on funds due from the contractor or with the extent of the contractor's obligation, if any, to the subcontractor; it concerned itself solely with funds due from the owner and vested in materialmen employed by subcontractors the stop notice remedy directly against funds due or to become due from the owner to the contractor without regard to the relationship between the contractor and the subcontractor. Presumably the Legislature considered this to be fair and equitable to all those concerned in view of the fact that the engagement of the subcontractor is the contractor's responsibility and the materials furnished by the materialmen actually contribute to the full performance of

the general contract between the owner and the contractor and the completion of the building.

In *St. Michael's, etc., Hopewell v. Conneen Const. Co., supra,* materialmen furnished supplies to the subcontractor and in due course filed and served stop notices upon the owner under section 3. The subcontractor defaulted and the contractor completed his work at a loss. Vice-Chancellor Davis held that under their stop notices the materialmen were entitled to be paid from funds due from the owner to the contractor even though nothing was due from the contractor to the subcontractor. In the course of his opinion he cited section 3 as amended and noted in 114 *N. J. Eq.* at *page* 281, that its purpose was "to secure to workmen and material-men the moneys due them whether from the contractor or subcontractor, and clearly provides that such moneys should be paid by the owner out of moneys owing by the owner on the general contract." And later on in 114 *N. J. Eq.* at *page* 282, he again remarked that the statute was "clearly intended to protect the materialmen and have their claims paid out of moneys due by the owner to the contractor." He quoted a provision in the agreement between the contractor and the subcontractor to the effect that all materials delivered to the building site " 'shall be regarded as the property' " of the contractor and found that in at least that respect the case before him differed from *Mills & Co. v. Hegeman-Harris Co., supra.* The Court of Errors and Appeals affirmed the judgment in favor of the materialmen on the opinion of the vice-chancellor. Although the vice-chancellor's factual distinction between the *Conneen* case and the *Hegeman-Harris* case may have been accurate, it is difficult to attach any legal significance to it. The materials in the *Hegeman-Harris* case became part of the owner's building and the point at which title actually passed would appear to have no bearing whatever on the meaning and effect of the statutory stop notice provisions.

In *Noland Co., Inc. v. Chelsea Housing Corp.,* 64 *N. J. L. J.* 469 (1941) Judge Avis, sitting in the United States District Court for the District of New Jersey, took the

position that the *Hegeman-Harris* case had in effect been overruled by the *Conneen* case and that under section 3, as revised in *R. S.* 2:60–116–121, materialmen employed by a subcontractor were entitled to their stop notice remedy against funds due from the owner to the contractor even though there was nothing owing from the contractor to the subcontractor. On appeal his decision was reversed on the ground that since the *Hegeman-Harris* case had not been expressly overruled by the Court of Errors and Appeals, the federal judges, notwithstanding their doubts as to its correctness, were bound to follow it. *Noland Co., Inc. v. Chelsea Housing Corp.,* 128 *F.* 2*d* 872 (*C. C. A.* 3 1942). In *National Radiator Co. v. Chelsea, etc., Corp.,* 22 *N. J. Misc.* 193 (*Circ. Ct.* 1944), the court held that the contractor was not a proper party in an action against the owner by materialmen employed by subcontractor; in the course of his opinion Justice Burling (then Circuit Court judge) pointed out that in the *Conneen* case Vice-Chancellor Davis had distinguished the *Hegeman-Harris* case on the factual issue as to when title passed. In *Tile Wholesalers, etc., Inc. v. Ruppert,* 125 *N. J. L.* 597 (*Sup. Ct.* 1941), a materialman engaged by a subcontractor filed and served his stop notice and in due course instituted his action against the owners. The judgment in his favor was sustained by the former Supreme Court but apparently no issue was raised under the *Hegeman-Harris* case. Effective January 1, 1952 section 3 was again revised as part of *Title 2A. N. J. S.* 2*A*:44–77–82. Unlike earlier revisions, the statutory language was placed in modern dress and restates the clear legislative objectives that materialmen employed by a subcontractor may, where the subcontractor has refused payment, file stop notices and serve copies on the owner; thereafter the owner is authorized to retain the amounts claimed by the materialmen from the sums due or to become due on the contract; and upon continued refusal of payment by the subcontractor, and being satisfied of the correctness of the claims, the owner is directed to pay them and is entitled to an allowance in the settlement of his accounts with the contractor.

■ We are satisfied that the construction of section 3 in the *Hegeman-Harris* case unduly restricted the legislative objectives; indeed, the brief of the respondent in the instant matter takes no position to the contrary. Instead it confines itself to the argument that since the decision in *Hegeman-Harris* was rendered over 30 years ago and no explicit legislative action has been taken to nullify it, this court should now reaffirm it as the law of the State. See *Barringer v. Miele*, 6 *N. J.* 139, 144 (1951). Its contention rests entirely on the concomitant principles of *stare decisis* and legislative acquiscence in the judicial interpretation of statutes. To the extent that these principles afford measures of stability and predictability in our legal system they are of great social value. They undoubtedly dictate the view that adherence to precedent "should be the rule and not the exception." *Cardozo, The Nature of the Judicial Process* 149 (1921). But they are not absolutes and under cogent circumstances they must give way to overriding considerations which recognize that the purpose of our legal system is to serve justly the needs of present day society and, to that end, judges remain free to re-examine earlier determinations and correct judicial errors whether they be their own or those of their predecessors. In a lecture delivered before the Association of the Bar of the City of New York, Justice Douglas had occasion to collect the significant number of cases in which the United States Supreme Court has expressly overruled precedents; included were five recent instances which involved the discarding of earlier statutory interpretations. See *Douglas, Stare Decisis* 20 (1949). Similarly, this court has, on several occasions within the past five years, been called upon to overrule earlier decisions, some of which embodied erroneous statutory interpretations. See *Eggers v. Kenny*, 15 *N. J.* 107 (1954); *New Jersey Power & Light Co. v. State Dept. of Pub. Utility Com'rs.*, 15 *N. J.* 82 (1954); *State v. Monahan*, 15 *N. J.* 34 (1954); *Pennsylvania-Reading S. S. Lines v. Board of Pub. Utility Com'rs*, 5 *N. J.* 114 (1950), *certiorari* denied *Brotherhood of R. R. T. v. Pennsylvania-Reading S. S. Lines*, 340 *U. S.* 876, 71 *S. Ct.* 122, 95 *L. Ed.* 637 (1950); *State v.*

*Garford Trucking, Inc.,* 4 *N. J.* 346 (1950) ; *Saco v. Hall,* 1 *N. J.* 377 (1949). *Cf. State v. Lefante,* 12 *N. J.* 505 (1953) ; *Greenspan v. Slate,* 12 *N. J.* 426 (1953).

In *Pennsylvania-Reading S. S. Lines v. Board of Pub. Utility Com'rs., supra,* this court, in rejecting the earlier construction of our Utility Act in *O'Connor v. Board of Public Utility Com'rs.,* 129 *N. J. L.* 263 (*E. & A.* 1942) said:

"It is urged on us that the construction put on the statute by the *O'Connor* case became a part of the statute which we may not change, that power residing solely in the Legislature. However, this rule of legislative acquiescence in the well settled interpretation of a statute is but one of several principles that may guide a court in arriving at the true meaning of a legislative act. It is no more than an aid in statutory construction and it is merely one factor in the total effort to give meaning to the language of the statute. Moreover, it has been held that 'one decision construing an act does not approach the dignity of a well settled interpretatiton,' *United States v. Raynor,* 302 *U. S.* 540, 552, 58 *S. Ct.* 353, 358, 82 *L. Ed.* 413, 420 (1938). The doctrine here contended for is not uniformly controlling; it must not be permitted to fetter the courts in their search for light. The principle of *stare decisis* which lies behind the doctrine is entitled to respect, but it must not blind us to realities; it is not an idol to be worshipped in following either a judicial precedent or an antecedent statutory construction."

See *Sprecher, The Development of the Doctrine of Stare Decisis and the Extent to Which It Should be Applied,* 31 *A. B. A. J.* 501 (1945) ; *Ellenbogen, The Doctrine of Stare Decisis and the Extent to Which It Should be Applied,* 20 *Temp. L. Q.* 503 (1947).

▮ The decision in *Hegeman-Harris* may not rightly be said to embody any well settled interpretation of our Mechanics' Lien Law. The opinion there rendered by Vice-Chancellor Griffin, against the materialmen employed by the subcontractor, contained only a summary disposition and the affirmance by the Court of Errors and Appeals was on the opinion below. When later confronted with the same issue in the *Conneen* case Vice-Chancellor Davis reached a contrary result in an opinion which, while distinguishing *Hegeman-Harris* factually, contained expressions suggesting disagreement with its views. Here again the Court of Errors and

Appeals affirmed on the opinion below. It appears to us, as it did to Judge Avis in the *Noland* case, that although there had been no express overruling, the *Conneen* decision largely nullified the interpretation in *Hegeman-Harris*. Since the *Conneen* case there have been no decisions in our appellate courts supporting *Hegeman-Harris*. Under the circumstances we consider ourselves free to adopt the statutory interpretation which appears to be dictated by the terms of the Mechanics' Lien Law, and thus faithfully discharge our continuing judicial function of fairly seeking and effectuating the legislative purposes as expressed therein. Such interpretation supports fully the position advanced by the materialmen in the instant matter; to the extent that *Hegeman-Harris* holds to the contrary, it is now expressly overruled.

Reversed.

HEHER, J. (dissenting). The judgment of this court overruling *Mills & Co. v. Hegeman-Harris Co.*, 94 *N. J. Eq.* 802, decided in 1923, subjects the contractor, by execution against the owner's contractual obligation, to a liability of $24,983.02, *extra* the subcontract, that is nonexistent under the Mechanics' Lien Law as there unanimously interpreted by the Court of Errors and Appeals, an interpretation that long since became settled law by legislative acceptance.

The holding was that there was then no statute "which makes the contractor liable for making advance payments." There is none now, for the Legislature concededly has not undertaken to make such provision. My brethren say that this construction "unduly restricted the legislative objectives," and while the "concomitant principles of *stare decisis* and legislative acquiescence in the judicial interpretation of statutes" are of "great social value" to the extent that they "afford measures of stability and predictability in our legal system," they "are not absolutes and under cogent circumstances they must give way to overriding considerations which recognize that the purpose of our legal system is to serve justly the needs of present day society and, to that end, judges remain free to re-examine earlier determinations and

correct judicial errors whether they be their own or those of their predecessors." But is it just to the corporate contractor to overrule, now for the first time after 31 years, a judicial construction on which it had placed justifiable reliance as a part of the law itself? Was it not a well-settled interpretation, so much so as to render the inference of legislative acceptance conclusive? And is not its rejection now judicial intrusion upon the legislative function?

The case of *St. Michael's Orphan Asylum and Industrial School of Hopewell v. Conneen Const. Co.*, 114 *N. J. Eq.* 276 (*Ch.* 1933), affirmed upon the opinion of Vice Chancellor Davis, 115 *N. J. Eq.* 334 (*E. & A.* 1933), did not overrule the holding of the *Hegeman-Harris* case that the contractor prevailed over the unpaid materialmen of the subcontractor. There, it was held to be a differentiating circumstance that by specific provision in the subcontract title to the materials passed to the contractor upon delivery at the work site. And in the later case of *Noland Co. v. Chelsea Housing Corp.*, 128 *Fed. 2d* 872, decided in 1942, Judge Maris, for the Third Circuit Court of Appeals, referred to the distinction and observed that the Court of Errors and Appeals, "when the *Conneen* case came to it on appeal, did not take the plainly proffered opportunity to overrule the *Hegeman-Harris* decision," but affirmed the decree in Chancery on the opinion there which "expressly distinguished the two cases." The law of the *Hegeman-Harris* case was applied, and the judgment of the District Court for the District of New Jersey was reversed. And still there has been no legislative action to correct what is now held, after nearly a third of a century, to be plain misinterpretation.

The meaning given the Mechanics' Lien Law by the court of last resort in the *Hegeman-Harris* case is to be regarded as "though expressed in the statute itself in specific words." *Guaranty Trust Co. of New York v. Blodgett*, 287 *U. S.* 509, 53 *S. Ct.* 244, 77 *L. Ed.* 463 (1933). A "long and uniform construction" of a statute "amounts to positive law." 50 *Am. Jur.* 199. The interpretation of the court of last resort fixes the meaning of the statute "as definitely as if it had

been so amended by the legislature." *Winters v. People of State of New York*, 333 *U. S.* 507, 68 *S. Ct.* 665, 92 *L. Ed.* 840 (1948). A "long period of accommodations to an older decision sometimes requires us to adhere to an unsatisfactory rule to avoid unfortunate practical results from a change." *Helvering v. Griffiths*, 318 *U. S.* 371, 63 *S. Ct.* 636, 87 *L. Ed.* 843 (1943). When a case is decided "it is expected that people will make their behavior conform to the rule it lays down and also to the principle expressed in so far as it can be determined"; and when contract rights or property rights growing out of contracts are involved, "the one who argued against the established law is not given the benefit of the change he helped bring about inasmuch as his adversary relief upon the previous law. Such decisions apply the old law to the case at hand while establishing new law for the future." *Warring v. Colpoys*, 74 *App. D. C.* 303, 122 *F. 2d* 642, 136 *A. L. R.* 1025 (*Ct. App. D. C.* 1941). Vinson, J., continued:

"Now if a legislature makes some law, again it is expected that people will conform to its provisions. If a court later construes the Act, it is expected, likewise, that behavior will be adjusted compatibly with the decision even though the court says that the statute means something other than what most people thought that it meant. There would be uncertainty and criticism if each person proceeded to conduct himself according to his own notion of what the statute meant in the face of what the court had said."

In *Douglass v. Pike County*, 101 *U. S.* 677, 25 *L. Ed.* 968 (1880), Chief Justice Waite, considering the question of the destruction of "vested rights" under judicial interpretation of statutes by decisions later given, said that

"where different constructions have been given to the same statute at different times, we have never felt ourselves bound to follow the latest decisions, if thereby contract rights which have accrued under earlier rulings will be injuriously affected. * * * The true rule is to give a change of judicial construction, in respect to a statute, the same effect in its operation on contracts and existing contract rights that would be given to a legislative amendment; that is to say, make it prospective, but not retroactive. After a statute has been settled by judicial construction, the construction becomes, so

far as contract rights acquired under it are concerned, as much a part of the statute as the text itself, and a change of decision is, to all intents and purposes, the same in its effect on contracts as an amendment of the law by means of a legislative enactment."

Again, it was said, recognizing the right of a state court to change its decisions, that "ordinarily we will follow them, except so far as they affect rights vested before the change was made."

Where it is asserted that a contract has been entered into "on the faith of the state laws, existing at the time when it was made, the construction of such laws, which was settled at the time of the making of the contract, by the court of last resort of the state, will be adopted and applied" by the Federal Supreme Court "in considering the nature of the contract right relied upon." *Warburton v. White*, 176 *U. S.* 484, 20 *S. Ct.* 404, 44 *L. Ed.* 555 (1900). See, also, *Anderson v. Santa Anna Township*, 116 *U. S.* 356, 6 *S. Ct.* 413, 29 *L. Ed.* 633 (1886).

Such is, on the plainest principles of justice, the answer to the thesis that the superseded judicial construction never was the law.

And the Supreme Court said, though decisions of the lower courts based on dictum standing for 30 years "are plainly correct," yet "if they were doubtful, we should at this late day hesitate to disturb them." *State of Missouri v. Ross*, 299 *U. S.* 72, 57 *S. Ct.* 60, 81 *L. Ed.* 46 (1936). Mr. Justice Sutherland also observed that the nonexercise of the legislative amendatory power for so many years was "persuasive evidence of the adoption" by the Congress of the judicial construction.

The Pennsylvania Supreme Court held that under the doctrine of *stare decisis*, its construction of a legislative act "has the same effect as if written into the body of the statute at the time of its enactment," and a statutory construction, "once made and followed, should never be altered upon the changed views of new personnel of the court"; otherwise, it was said, " 'the knowne certaintie of the law,' which Lord Coke so wisely said 'is the safetie of all,' would be utterly

destroyed." *In re Burtt's Estate,* 353 *Pa.* 217, 44 *A.* 2d 670, 162 *A. L. R.* 1053 (*Sup. Ct.* 1945).

The rule of *stare decisis* is designed to give the uniformity, certainty and stability without which law can have no real meaning. The eradication of error in construction, if there be such, cannot be had at the sacrifice of the just rights of one who in good faith relied upon the law as expounded by the court of last resort. This is not to say that I deem the interpretation of the *Hegeman-Harris* case erroneous. I have given no consideration to that: for I consider it to be beyond judicial revision at this late day. It is now a matter within the exclusive province of the Legislature. The parties here contracted in the context of the law as settled long since by the exposition of the Court of Errors and Appeals. Would not any lawyer of whom advice was asked say as much without any reservation? *Hegeman-Harris* was the unanimous decision of a very distinguished court of last resort. And the interpretation was not rejected in the *Conneen* case ten years later, but reaffirmed on the basis of a differentiating factual circumstance. In this, there would be no injustice to the materialmen, for the supplies were furnished under the law as thus interpreted.

I would affirm the judgments.

OLIPHANT, J., joins in this dissent.

*For reversal*—Chief Justice VANDERBILT, and Justices WACHENFELD, BURLING, JACOBS and BRENNAN—5.

*For affirmance*—Justices HEHER and OLIPHANT—2.